S10A1773. GWINNETT COUNTY SCHOOL DISTRICT et al.
v. COX et al.
(710 SE2d 773)

HUNSTEIN, Chief Justice.

This appeal involves a constitutional challenge to the 2008 Georgia Charter Schools Commission Act, OCGA § 20-2-2080 et seq. (the "Act"). Appellants/plaintiffs are local school systems[1] whose 2009 and 2010 complaints were consolidated by the trial court; appellees/defendants are former State School Superintendent Kathy Cox (in her official capacity), the Georgia Charter Schools Commission, its chairperson and members (in their official capacities), the Georgia Department of Education, and the first three schools chartered under the Act.[2] Appellants contend, inter alia, that the Act is unconstitutional because it violates the "special schools" provision in the Georgia Constitution of 1983. See Art. VIII, Sec. V, Par. VII (a). Because our constitution embodies the fundamental principle of exclusive local control of general primary and secondary ("K-12") public education and the Act clearly and palpably violates Art. VIII, Sec. V, Par. VII (a) by authorizing a State commission to establish competing State-created general K-12 schools under the guise of being "special schools," we reverse.

1. (a) "Authority is granted to county and area boards of

---

[1] Gwinnett County School District; the Bulloch and Candler County School Districts; the DeKalb County School District and the Atlanta Independent School System; and the Griffin-Spalding County and Henry County School Districts.

[2] Ivy Preparatory Academy, Charter Conservatory for Liberal Arts and Technology and Heron Bay Academy.

education to establish and maintain public schools within their limits." Art. VIII, Sec. V, Par. I of the 1983 Georgia Constitution. This language continues the line of constitutional authority, unbroken since it was originally memorialized in the 1877 Constitution of Georgia, granting local boards of education the exclusive right to establish and maintain, i.e., the exclusive control over, general K-12 public education. See *McDaniel v. Thomas*, 248 Ga. 632 (285 SE2d 156) (1981) (setting forth in an appendix, id. at 649-659, a comprehensive review of the history of Georgia public education). Art. VIII, Sec. V, Par. I sets forth the sole delegation of authority in our constitution regarding the establishment and maintenance of general primary and secondary public schools. No other constitutional provision authorizes any other governmental entity to compete with or duplicate the efforts of local boards of education in establishing and maintaining general K-12 schools.[3] By providing for local boards of education to have exclusive control over general K-12 schools, our constitutions, past and present, have limited governmental authority over the public education of Georgia's children to that level of government closest and most responsive to the taxpayers and parents of the children being educated. The constitutional history of Georgia could not be more clear that, as to general K-12 public education, local boards of education have the exclusive authority to fulfill one of the "primary obligation[s] of the State of Georgia," namely, "[t]he provision of an adequate public education for the citizens." Art. VIII, Sec. I, Par. I.

(b) Unlike general K-12 public education, provisions for "special schools" are a more recent addition to our constitution. In 1966, the 1945 Georgia Constitution was amended to give local boards of education the authority to establish "one or more area schools, including special schools such as vocational trade schools, schools for exceptional children, and schools for adult education, in one or more of such political subdivisions." See Ga. L. 1966, pp. 1026, 1029-1030, § 3 (proposing constitutional amendment); Ga. L. 1967, p. 1127 (noting its ratification). This exact language was retained with no significant change when the 1945 Georgia Constitution was replaced by the 1976 Constitution. See Art. VIII, Sec. IX, Par. I of the 1976 Georgia Constitution.

Our current constitution, approved by the electorate in 1983, yet again preserves the now 134-year-old status quo in regard to exclusive local control over general K-12 public education. Art. VIII,

---

[3] Art. VIII, Sec. V, Par. I gives the General Assembly authority only to consolidate existing school systems or portions thereof to operate "under the control and management of a county or area board of education."

Sec. V, Par. I. However, "special schools" are now addressed in an entirely revised paragraph. Art. VIII, Sec. V, Par. VII (a).[4] That paragraph states that

> [t]he General Assembly may provide by law for the creation of special schools in such areas as may require them and may provide for the participation of local boards of education in the establishment of such schools under such terms and conditions as it may provide. . . .

Id. This paragraph eliminated the previous constitutional language that included "special schools" as one type of "area school"; authorized the creation of "special schools" by the General Assembly alone or together with the local boards of education; and deleted the three specific examples of "special schools" set forth in the earlier constitutions, thereby authorizing the General Assembly to provide by law for the creation of any type of special school.

(c) In 2008, the General Assembly enacted the Georgia Charter Schools Commission Act[5] pursuant to which it established the Georgia Charter Schools Commission, OCGA § 20-2-2082 ("the Commission"), and authorized the Commission, inter alia, to "assist in the establishment of commission charter schools throughout this state." OCGA § 20-2-2083 (b) (1). A "commission charter school" is defined as

> a charter school authorized by the [C]ommission . . . whose creation is authorized as a special school pursuant to Article VIII, Section V, Paragraph VII of the Constitution. A commission charter school shall exist as *a public school within the state as a component of the delivery of public education within Georgia's K-12 education system.*

(Emphasis supplied.) OCGA § 20-2-2081 (2). The Commission is also charged with the duty of collaborating with "cosponsors"[6] for "the purpose of providing the highest level of public education *to all students*, including, but not limited to, low-income, low-performing,

---

[4] The 1983 Constitution separated area schools from special schools and addressed area schools in Art. VIII, Sec. V, Par. I.

[5] "State chartered special schools" established under the Charter Schools Act of 1998, OCGA § 20-2-2060 et seq., are not in issue in this appeal and we intimate no opinion as to their status under the 1983 Georgia Constitution.

[6] A "cosponsor" means "a municipality, county, consolidated government, university or college of the board of regents, technical institution of the Technical College System of Georgia, or regional education service agency which has been authorized by the commission . . . ." OCGA § 20-2-2081 (3).

gifted, and underserved student populations and to students with special needs." (Emphasis supplied.) OCGA § 20-2-2083 (b) (12). As the language in the Act and the record in this case reflect, the commission charter schools established by the Commission pursuant to the Act are created to deliver K-12 public education to any student within Georgia's general K-12 public education system. Commission charter schools thus necessarily operate in competition with or duplicate the efforts of locally controlled general K-12 schools by enrolling the same types of K-12 students who attend locally controlled schools and by teaching them the same subjects that may be taught at locally controlled schools.

2. Appellants contend the Act is unconstitutional because the schools the Commission is authorized to create are not "special schools" under Art. VIII, Sec. V, Par. VII (a). In addressing this challenge to the constitutionality of the Act, we recognize at the outset that

> all presumptions are in favor of the constitutionality of an act of the legislature and that before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this [C]ourt must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, . . . the burden is on the party alleging a statute to be unconstitutional to prove it.

(Citations and punctuation omitted.) *Dev. Auth. of DeKalb County v. State of Ga.*, 286 Ga. 36, 38 (1) (684 SE2d 856) (2009).

(a) " 'Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption.' [Cit.]" *Clarke v. Johnson*, 199 Ga. 163, 166 (33 SE2d 425) (1945). As discussed above, at the time the 1983 Constitution was adopted, local boards of education had been constitutionally vested for more than 100 years with the exclusive control over the establishment and maintenance of general K-12 public education. See Division 1 (a), supra. The "special schools" were not competitors with locally controlled schools in regard to the education of general K-12 students; rather, the scope of special schools was demonstrated by the examples of "special schools" expressly contained in Georgia constitutions since 1966. Examples of "special schools" were "vocational trade schools, schools for exceptional children, and schools for adult education." See Ga. L. 1966, p. 1030, § 3. As each of these examples of "special schools" helps to demonstrate, the constitutionally significant matters that made a school "special" were a matter directly related to the school itself — its student body and its curriculum. In

light of these long-standing constitutional examples, we recognize that the "conditions existing" at the time of the adoption of the 1983 Constitution reflected that "special schools" were those that enrolled only students with certain special needs, e.g., adults, deaf or blind children, and those that taught only certain special subjects, e.g., vocational trade schools with jobs-oriented curricula. Based on these "conditions existing" at the time the 1983 Constitution was adopted and in light of the reaffirmation in that constitution of the authority granted local boards of education "to establish and maintain public schools within their limits," Art. VIII, Sec. V, Par. I, the "special schools" language in Art. VIII, Sec. V, Par. VII (a) cannot be interpreted either as a relinquishment of the historical exclusivity of control vested in local boards of education over general K-12 schools or as a carte blanche authorization for the General Assembly to create its own general K-12 schools so as to duplicate the efforts of or compete with locally controlled schools for the same pool of students educated with the same limited pool of tax funds.

(b) In construing the meaning of constitutional language, it can also be useful to consider the understanding expressed by the people involved in the drafting and ratifying of the constitution. *Collins v. Mills*, 198 Ga. 18, 22 (30 SE2d 866) (1944). Two matters are readily apparent from the transcriptions from the committee and subcommittee meetings of the participants working on the revision of Article VIII. The first is the consensus among all the participants that "special schools" were indeed those schools that enrolled only students with certain special needs or taught only certain special subjects. As succinctly stated by Speaker Thomas B. Murphy of the House of Representatives, member of the Select Committee on Constitutional Revision, in regard to Art. VIII, Sec. V, Par. VII (a),

> The reason for this paragraph in the constitution is it allows the General Assembly to establish schools for the blind, deaf, or people of that nature. That's the reason for this. We might need to establish — we've got one in Atlanta, we've got one in Cave Springs, and we might need to establish one in south Georgia, and that's the reason for that part in the constitution.

Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Legislative Overview Committee, Vol. I, meeting of June 18, 1981, p. 67. See also Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Committee to Revise Article VIII, Vol. III, meeting of the Subcommittee on Local School Systems, September 4, 1980, p. 51, statement by Chairman Thornhill that "[w]e're talking about special schools, and special schools is

interpreted as vocational schools, et cetera"; id. at meeting of the Committee to Revise Article VIII, September 23, 1980, p. 29, statement by Chairman Thornhill of the Subcommittee on Local School Systems that the "special schools . . . are schools, vo-tech schools, adult education, exceptional children and so on." Because this consensus view of the meaning of "special schools" is consistent with the previous constitution, it explains why the drafters envisioned the "special schools" paragraph as constituting only "an editorial revision," with the "major change" being the new paragraph's authorization of the creation of special schools "by general or local law." Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Legislative Overview Committee, Vol. I, meeting of June 18, 1981, p. 65 (subcommittee report by assistant executive director Melvin B. Hill, Jr., to Legislative Overview Committee).[7]

The second matter revealed by the transcripts is that, notwithstanding the decision to delete the three examples of "special schools" contained in the previous constitutions in favor of "broadening" the "special schools" phrase in order to include "any type of *special* school" (emphasis supplied), see id., meeting of the Legislative Overview Committee, June 18, 1981, p. 76, the drafters and participants never considered "special schools" as including any type of general K-12 school. To the contrary, the transcripts reflect that even Mr. Hill, the proponent of "broadening" the "special schools" phrase, clearly maintained that "special schools" were "whatever schools *other than the primary and secondary education level schools.*" (Emphasis supplied.) Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Committee to Revise Article VIII, Vol. III, meeting of the Subcommittee on Local School Systems, August 21, 1980, p. 53.

Based on these comments by the drafters and participants in the framing of the 1983 Constitution, we conclude that it was their clearly understood and plainly expressed position that "special schools" in Art. VIII, Sec. V, Par. VII (a) meant those schools that

---

[7] We recognize that comments made during the transcribed meetings indicate that some participants considered "special schools" in the 1976 Constitution to include *only* vocational trade schools, schools for exceptional children and schools for adult education because those were the three examples specifically set forth in the 1976 constitution. See Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Legislative Overview Committee, Vol. I, meeting of June 18, 1981, p. 76 (comment by assistant executive director Melvin B. Hill, Jr.). However, others expressed the notion that the 1976 Constitution did not limit "special schools" to those three examples. See Select Committee on Constitutional Revisions, 1977-1981, Transcript of Meetings, Committee to Revise Article VIII, Vol. III, meeting of the Subcommittee on Local School Systems, August 21, 1980, p. 56 (comment by participant Vickie Greenberg). In any event, none of the comments reflect any belief that "special schools" might include within its ambit any general K-12 public schools. See infra.

enrolled only students with certain special needs or taught only certain special subjects and did *not* include general K-12 schools comparable to those under the exclusive control of local boards of education.

(c) Finally, "[w]hen interpreting words used in the Constitution the presumption is that they were used according to their 'natural and ordinary meaning.' [Cits.]" *Williamson v. Schmid*, 237 Ga. 630, 632 (229 SE2d 400) (1976). The word "special" does not authorize an interpretation that includes antonymic modifiers such as general, regular, typical, ordinary, or any other "un"-special descriptive term. Moreover, "special" must be interpreted as a term denoting a difference of constitutional significance, both because to interpret it otherwise would eliminate the reason to include this modifier in Art. VIII, Sec. V, Par. VII (a) and because otherwise the exclusive grant of authority to local school boards in Art. VIII, Sec. V, Par. I over general K-12 schools would be rendered meaningless. Established rules of constitutional construction prohibit us from any interpretation that would render a word superfluous or meaningless. See generally *Blum v. Schrader*, 281 Ga. 238 (2) (637 SE2d 396) (2006). Finally, we must recognize the significance of the fact that "special" modifies "school." Hence, "special" must relate to the school itself if " 'all [of the constitutional paragraph's] parts [are to be construed so as] to give a sensible and intelligent effect to each [of them].' " *Brown v. Liberty County*, 271 Ga. 634, 635 (522 SE2d 466) (1999). As noted above, see Division 1 (b), supra, the constitutionally significant matters that make a school "special" include, but are not limited to, matters directly related to the school itself, i.e., its student body and its curriculum.

It is not necessary here to provide a definitive list of the specific features and characteristics relative to a school itself that *must* be present in order to qualify a school as a "special school" under Art. VIII, Sec. V, Par. VII (a). Rather, in this particular case, the phrase "special schools" is most readily interpreted by defining what those schools are *not*. From both the natural meaning of the "special schools" phrase and the constitutional history of Art. VIII, Sec. V, Par. VII (a) set forth in Divisions 2 (a) and (b), supra, "special schools" are not general K-12 schools. They are not schools that enroll the same types of K-12 students who attend general K-12 public schools; they are not schools that teach the same subjects that may be taught at general K-12 public schools. To interpret "special schools" under Art. VIII, Sec. V, Par. VII (a) as including those schools that are indistinguishable in every constitutionally significant manner from general K-12 schools established and maintained by local boards of education would render the "special" in "special schools" meaningless.

Based on the natural and ordinary meaning of the phrase "special schools" in Art. VIII, Sec. V, Par. VII (a), we hold that schools that "exist as a public school within the [S]tate as a component of the delivery of public education within Georgia's K-12 education system," OCGA § 20-2-2081 (2), and provide "public education to all students," see OCGA § 20-2-2083 (b) (12), do not qualify as "special schools."

3. In order to find a clear and palpable conflict between Art. VIII, Sec. V, Par. VII (a) and the Act, we must determine that the Act is not capable of being construed in harmony with that constitutional provision. See generally *Buice v. Dixon*, 223 Ga. 645, 647 (157 SE2d 481) (1967). Thus, we now turn to the different reasons that have been asserted in support of the position that commission charter schools created under the Act qualify as "special schools."

(a) We first respond to the assertion that commission charter schools are special schools because the General Assembly has determined that they are, see OCGA § 20-2-2081 (2), and had a rational basis for that determination. The 1983 Georgia Constitution contains no language allowing the General Assembly itself to define "special schools." Compare, e.g., Art. I, Sec. II, Par. VIII (b) (in provision providing for the legal operation of nonprofit bingo games, "[t]he General Assembly may by law define a nonprofit bingo game").[8] "Special school" is not a statutory phrase but a constitutional phrase. Construing the Constitution is the function of the judiciary and the General Assembly has no power to make such a construction. *Thompson v. Talmadge*, 201 Ga. 867 (41 SE2d 883) (1947). "[D]etermining the meaning of the Constitution, which is binding upon everyone, [is] the exclusive function of the courts in the adjudication of cases properly brought before them for decision." Id. at 872.[9] It is thus for this Court alone to determine whether legislation enacted by the General Assembly is inconsistent with the Constitution and where, as here, such an inconsistency has been determined to exist, it is irrelevant whether any rational basis exists for the legislation.

(b) It is asserted that commission charter schools come within the definition of "special schools" because that term was "broadened" in the 1983 Georgia Constitution by the elimination of the three examples of "special schools" set forth in the prior constitu-

---

[8] We intimate no opinion on whether, even assuming the General Assembly was constitutionally authorized to define "special schools," it could authorize the establishment of general K-12 schools under the guise of "special schools" so as to usurp the exclusive control over general K-12 public schools placed in local boards of education by Art. VIII, Sec. V, Par. I.

[9] For this same reason we reject the argument that opinions by the State Attorney General can determine the meaning of "special schools."

tions, namely, vocational trade schools, schools for exceptional children, and schools for adult education. See Art. VIII, Sec. IX, Par. I of the 1976 Georgia Constitution. While the striking of these three examples clearly authorized the General Assembly to create any type of *special* school, the limitation on a school being "special" *was* retained; hence, Art. VIII, Sec. V, Par. VII (a) cannot be read as authorizing the General Assembly to create any type of school that is *not* special. Had granting the General Assembly the authority to create non-special schools been the intent, it readily could have been accomplished by striking "special" at the same time the three examples were deleted. We therefore must conclude that nothing in the striking of the examples in the 1983 Constitution authorized the General Assembly to create non-special schools.

(c) In reliance on commission charter schools' unique charters, their individualized, performance-based contracts and their educational philosophy, the assertion is made that commission charter schools are "special schools" because they are special in their operation. But every general K-12 public school has an educational philosophy; every general K-12 public school has a "unique operating charter" — whether memorialized in writing or merely implicit in the unique nature of each school's faculty, administration and student body; and every educator in every general K-12 public school is required to teach his or her students in accordance with the same statutory standards of professional performance, see the Georgia Professional Standards Act, OCGA § 20-2-981 et seq., that govern the conduct of all of the State's educators. These are not differences that make commission charter schools "special": they are the same strengths that may be found in all general K-12 schools, whether locally controlled or Commission established.

(d) Turning to the next reason, it is asserted that because of the manner in which commission charter schools are created, i.e., by the Commission by means of the Act passed by the General Assembly, they are "special schools" because they are "outside the ordinary source of schools," i.e., not created by local boards of education. In other words, the Commission has the authority to create "special" schools and schools are "special" because the Commission created them. This circular reasoning aside, there are certainly differences between local boards of education and the Commission. On the one hand, local school boards are comprised of members who live in their schools' districts and must be elected to their positions by the parents and taxpayers residing in the areas from which the students are drawn and the local schools taxes are raised. See Art. VIII, Sec. V, Par. II; Art. VIII, Sec. VI, Par. I. The Commission, on the other hand, is comprised of seven political appointees who are selected by the governor, the president of the Senate (i.e., the lieutenant

governor) and the speaker of the House, see OCGA § 20-2-2082 (b); hence, its members are not accountable in any manner either to the parents or to the taxpayers. But Art. VIII, Sec. V, Par. VII (a) speaks of "special schools," *not* "schools from special sources." The differences that may exist as to the type of entity that establishes a school are not constitutionally significant if those differences have no impact on the school itself. As demonstrated in this case, the fact that commission charter schools are established by the Commission does not affect the types of students enrolled or the curricula taught; the commission charter schools do not enroll students categorically different from those at locally controlled schools or teach subjects wholly unlike those that may be taught in locally controlled schools merely because they were established by the Commission, rather than a local board of education. In the context provided by Art. VIII, Sec. V, Par. VII (a), a difference so wholly unrelated to a school itself cannot serve to render the school "special" within the meaning of our Constitution.

A corollary of this assertion is that the commission charter schools are "special schools" because they are not directly funded by local school taxes. Aside from the fact that State tax dollars are no more special than local tax dollars — both have the same purchasing power — there is yet again no constitutional significance as to the source of funding that would render a school "special" for purposes of Art. VIII, Sec. V, Par. VII (a).

(e) The final reason asserted for commission charter schools being defined as "special schools" is also the least persuasive. Our attention is directed to one statute, OCGA § 20-2-370, regarding the requirement of a referendum to annul a municipal or independent school district's "special school law"; an opinion from this Court applying that statute, see *Upson County School Dist. v. City of Thomaston*, 248 Ga. 98 (281 SE2d 537) (1981); and a few brief instances of ill-considered language in three opinions dating from 1925 to 1955[10] in which the term "special school" is used in a manner wholly unrelated to the "special school" provision first incorporated into our constitution in 1966. See Division 1 (b), supra. None of these authorities are pertinent to the constitutional question of whether a school indistinguishable from the general K-12 public schools established by local boards of education is a "special school" under Art. VIII, Sec. V, Par. VII (a) merely because it was not created by a local board of education. However, to the extent these authorities may

---

[10] The opinions are *State Bd. of Education v. County Bd. of Education of Richmond County*, 190 Ga. 588 (10 SE2d 369) (1940), *Searcy v. State of Ga.*, 91 Ga. App. 603 (86 SE2d 652) (1955) and *Southern School Supply Co. v. City of Abbeville*, 34 Ga. App. 93 (128 SE 231) (1925).

seem pertinent to the issue, they are controlled by our discussion in Division 3 (d), supra.

In conclusion, none of the proffered reasons enable us to construe the Act in harmony with Art. VIII, Sec. V, Par. VII (a). See generally *Buice v. Dixon*, supra, 223 Ga. at 647. Labeling a commission charter school as "special" does not make it so when the students who attend locally-controlled schools are no less special than those enrolled in commission charter schools and the subjects taught at commission charter schools are no more special than the subjects that may be available at locally-controlled schools. We thus hold that the General Assembly's enactment of the 2008 Georgia Charter Schools Commission Act for the purpose of creating schools that do not qualify as "special schools" plainly and palpably conflicts with Art. VIII, Sec. V, Par. VII (a).

4. (a) Although we find the Act unconstitutional solely on the basis that it violates Art. VIII, Sec. V, Par. VII (a), the dissent, relying on *Blevins v. Dade County Bd. of Tax Assessors*, 288 Ga. 113 (3) (702 SE2d 145) (2010) (statute may not be struck down under a due process vagueness analysis unless it is unconstitutional in all of its applications), asserts that this Court must uphold the Act because the possibility exists that constitutionally permissible schools may be created thereunder, pointing to language in OCGA § 20-2-2083 (b) (12) that identifies "special needs" students as included among "all students" for which charter schools may provide the "highest level of public education." Because the Act's provisions clearly allow for the creation of unconstitutional schools, i.e., schools that are not genuinely "special schools," it follows that the dissent would have this Court exercise its inherent authority to judicially rewrite statutes by editing them in a manner to excise constitutionally defective provisions in order to avoid striking down an enactment of the General Assembly. See *Fortson v. Weeks*, 232 Ga. 472 (1) (208 SE2d 68) (1974).

However, even under the liberal application of this inherent authority proposed by the dissent, we are not able to uphold the Act. The problem is twofold. First, the Act contains no safeguards whatsoever to prevent the creation of unconstitutional schools. Compare *Livingston v. State*, 264 Ga. 402, 404 (1) (c) (444 SE2d 748) (1994) (noting as to OCGA § 17-10-1.2 that "our legislature has employed sufficient safeguards within the statute to ensure that victim impact evidence will not be admitted which reflects on factors which this court has found constitutionally irrelevant to death penalty sentencing, and which could result in the arbitrary and unconstitutional imposition of the death penalty"). Second, this Court cannot judicially rewrite a statute when the unconstitutional part "is so connected with the general scope of the statute that,

should it be stricken out, effect can not be given to the legislative intent." (Punctuation omitted.) *Fortson*, supra at 475. In that circumstance, the rest of the statute must fall with the defective language. Id. To judicially rewrite the Act, as the dissent would have us do, in order to limit its application only to the creation of commission charter schools that are genuine special schools under Art. VIII, Sec. V, Par. VII (a), would require this Court to reject the General Assembly's expressed intent that charter schools be used as a means of "maximizing access to a wide variety of high-quality educational options for *all* students regardless of disability, race, or socioeconomic status." OCGA § 20-2-2080 (b) (2). See also OCGA § 20-2-2083 (b) (12), reiterating that "highest level of public education [should be provided] to *all* students."[11]

Therefore, because narrowing the Act to avoid its unconstitutional infirmities "would be less a matter of reasonable judicial construction than a matter of substantial legislative revision," *State v. Fielden*, 280 Ga. 444, 448 (629 SE2d 252) (2006), we cannot agree with the dissent that this Court expand the scope of its inherent authority so as to rewrite the Act to render it constitutional.

(b) We have carefully considered the remaining arguments raised in support of the Act by the dissent and find them to be without merit.

5. The record establishes uncontrovertedly that the Georgia Charter Schools Commission Act and the schools established thereunder represent the efforts of well-intentioned people, motivated by their genuine concern over the current condition of this State's general K-12 public education, to provide the children of this State with an alternative and, in some cases, a superior educational opportunity. In holding the Act unconstitutional under the unique provisions of this State's Constitution, we do not in any manner denigrate the goals and aspirations that these efforts reflect. The goals are laudable. The method used to attain those goals, however, is clearly and palpably unconstitutional. Because the Georgia Charter Schools Commission Act violates Art. VIII, Sec. V, Par. VII (a) of the 1983 Constitution of Georgia, we reverse the trial court's order.

6. Our holding here renders it unnecessary to address appellants' remaining constitutional challenges to the Act.

*Judgment reversed. All the Justices concur, except Carley, P. J.,*

---

[11] Although the dissent also argues that the Act is constitutional because it has been properly applied to create a special school, specifically, a charter school for girls only, it does not explain why a single-sex school is a special school given that local boards of education are also authorized to create single-sex schools. See the No Child Left Behind Act of 2001, 20 USC § 7215 (a) (23), (c). See also, e.g., the single-gender schools in the Atlanta Public Schools system. http://www.atlantapublicschools.us/186110108171719813/site/default.asp

*Melton and Nahmias, JJ., who dissent.*

MELTON, Justice, dissenting.

Although I fully concur in the dissent written by Justice Nahmias, I write separately to emphasize the fundamental principles at play in this case. I also believe that it is necessary to point out that, even under the majority's faulty constructs and its incorrect definition of "special schools," these principles, which the majority fails to apply, require a finding that the Charter Schools Commission Act of 2008 ("Act") is constitutional.

Two bedrock rules of statutory construction govern in this matter: (1) in analyzing the Act, we must presume that the statute is, and was intended to be, constitutional; and (2) in the absence of a First Amendment overbreadth claim, the statute cannot be struck down unless it is unconstitutional in all of its applications or lacks a plainly legitimate sweep. *Dev. Auth. of DeKalb County v. State of Ga.,* 286 Ga. 36 (1) (684 SE2d 856) (2009); *Blevins v. Dade County Bd. of Tax Assessors,* 288 Ga. 113 (702 SE2d 145) (2010).

With regard to the first principle, a cursory review of the text of the Act supports the presumption of constitutionality, even under the test articulated by the majority. For example, the Legislative intent behind the Act is facially evident in its provisions regarding the contributions of cosponsors (other entities defined in OCGA § 20-2-2081 (3) such as counties or universities who help support charter schools). OCGA § 20-2-2080 (b) (2) indicates that cosponsors should be sought out to maximize "access to a wide variety of high-quality educational options for all students regardless of disability, race, or socioeconomic status, *including those students who have struggled in a traditional public school setting.*" (Emphasis supplied.) In addition, OCGA § 20-2-2083 (b) (12) tellingly gives the Georgia Charter Schools Commission the power to "[c]ollaborate with cosponsors for the purpose of providing the highest level of public education to all students, including, but not limited to, *low-income, low-performing, gifted, and underserved student populations and to students with special needs.*" (Emphasis supplied.) Even if one applies the majority's definition of "special schools" as those that "enrolled only students with certain special needs or taught only certain special subjects," these provisions unequivocally support a conclusion that the Act was *not* unconstitutional. The majority's contrary finding is not logical.

With regard to the second principle, it is untenable to argue that the Act is unconstitutional in all of its applications or lacks a plainly legitimate sweep. In fact, the existence of Ivy Preparatory Academy, a charter school for girls only, proves that the Act meets the majority's constitutional test, as it has been properly applied to

create a special school. Again, this remains true even under the definitions set forth in the majority opinion. Perhaps that is why the majority makes no attempt to argue that these particular schools fail its pronounced constitutional standard.

This case should be that simple. The Legislature, whom we must presume intended to act in a constitutional manner, created a law to provide for special charter schools to enhance our educational system, and it included evidence on the face of the statute supporting such a constitutional intent. Nevertheless, the majority looks beyond this basic principle to reach a result that simply cannot be explained in the context of the applicable law and the undisputed facts.

I am authorized to state that Presiding Justice Carley and Justice Nahmias join in this dissent.

NAHMIAS, Justice, dissenting.

In its quest to strike down the Charter Schools Commission Act of 2008, see OCGA § 20-2-2081 et seq. (the "2008 Act"), the majority disregards the ordinary meaning, context, and history of the provision of our State's Constitution that authorizes the General Assembly to "provide by law for the creation of special schools in such areas as may require them." Ga. Const. of 1983, Art. VIII, Sec. V, Par. VII (a). The majority's illogical reasoning and overbroad conclusion render the "special schools" provision a dead letter, effectively abrogating not just commission charter schools but also the state chartered special schools established under the Charter Schools Act of 1998 and any other "special school" the General Assembly might dare to create.

Most peculiar is the majority's fundamental premise that since 1877, Georgia's constitutions have granted "local boards of education the exclusive right to establish and maintain, i.e., the exclusive control over, general K-12 public education," Maj. Op. at 266 (citing Ga. Const. of 1983, Art. VIII, Sec. V, Par. I). In fact, as demonstrated below, for nearly as long as it has been a State, Georgia has always had *both* public schools and school systems that were established statewide in each county by general laws, which were often referred to as "common" schools, *and* individual schools and school systems that the General Assembly established directly through special and local laws, separate from the common county systems and referred to variously in the law as "not common," "independent," or "special" schools. Moreover, local boards of education — entities that are not even mentioned in the Constitution until 1945 — have never had and do not today have "exclusive control over general K-12 public education," because that control has always been shared with and regulated by the General Assembly and, since 1870, by the State Board of Education and State School Superintendent as well. See Ga.

Const. of 1983, Art. VIII, Secs. II-III. In stark contrast to this shared state and local authority over primary and secondary public education, the Constitution expressly grants the Board of Regents "the *exclusive* authority to create new public colleges, junior colleges, and universities in the State of Georgia . . . ." Art. VIII, Sec. IV, Par. I (b) (emphasis added). Thus, understood in true historical and textual context, commission charter schools are simply the latest iteration of the "special schools" that have long been created by the General Assembly outside the "common" local school systems in Georgia. The majority may be able to change our law, but it cannot change our history or the words of our Constitution.

Today four judges have wiped away a small but important effort to improve public education in Georgia — an effort that reflects not only the education policy of this State's elected representatives but also the national education policy of the Obama Administration. That result is unnecessary, and it is unfortunate for Georgia's children, particularly those already enrolled and thriving in state charter schools. It is equally unfortunate for this Court's reputation as an institution that fairly and accurately interprets the law and exercises the judiciary's most awesome power — the power to nullify laws enacted through the democratic process — only when that result is clearly and palpably dictated by our Constitution. See *Dev. Auth. of DeKalb County v. State of Ga.*, 286 Ga. 36, 38 (684 SE2d 856) (2009). The majority's reasoning and its result are terribly wrong, and if this case truly reflects the Court's position on the public education law of Georgia, it portends dire consequences that go far beyond the issue of state-created charter schools. I dissent.[12]

## I. *Background*

The majority holds that the "special schools" provision of the 1983 Georgia Constitution does not authorize the General Assembly to create "commission charter schools" as provided in the 2008 Act.[13] To understand why that holding is wrong, it is important to under-

---

[12] The Court's extension of its January 2011 Term with respect to this case, pursuant to OCGA § 15-2-4 (b), has ensured that there is adequate time for the Court to consider the issues and opinions presented as well as any motions for reconsideration that may be filed. The appellees' motions for reconsideration have identified additional serious defects in the majority opinion, and I have added several of those points to this dissent in this introduction and Divisions I (B) and II (B), (C), and (E) (3) below. The appellees cannot be faulted for failing to offer these arguments earlier, since the majority's rationale was never suggested by the appellants and indeed goes well beyond what the local school systems ever argued.

[13] This dissent focuses on the "special schools" issue relied on by the majority to reverse the trial court's judgment. To affirm the trial court, the Court would also need to consider and reject the many other constitutional and statutory challenges raised by the appellants against the 2008 Act, the Commission, and the commission charter school appellees. Having also studied those issues carefully, I would affirm the judgment on them as well, largely for the

stand the historical context of these issues and of the "special schools" provision in particular — a history that is truncated and twisted by the majority opinion. Laying out this background takes many pages, but it will illuminate the analysis that follows.[14]

## A. *The Colonial Period to 1877: County Schools Created by General Laws and "Independent" Schools Created by Special and Local Laws*

As explained in *McDaniel v. Thomas*, 248 Ga. 632 (285 SE2d 156) (1981), public education in Georgia has proceeded in fits and starts since the " 'presentation of a thousand spelling-books to James Edward Oglethorpe by James Leake, in 1732,' " id. at 649 (citation omitted), due in large part to inadequate and inequitable funding. See id. at 641-643, 649-659.[15] From the early days of statehood, there have been county schools and school "districts" (also called "systems") that were established statewide by general laws and sometimes referred to as "common" schools. There have also been individual schools and school systems established by special and local laws, separate from the common county systems and sometimes referred to as "not common," "independent," or "special" schools. Likewise, over time schools and school systems have reflected varying mixes of state and local funding and control. See generally id. at 633-638, 641-643, 649-659.

Thus, the original 1777 Constitution included a clause providing that " 'schools shall be erected in each county and supported at the general expense of the State, as the legislature shall hereafter point out and direct,' " although limited state funding required these schools to operate as private institutions and rely on tuition fees. *McDaniel*, 248 Ga. at 649 (quoting Article LIV of the 1777 Constitution). Later acts promoted a statewide system of public education, but the results were inconsistent. See id. at 649-651.

In 1868, after the Civil War, a new constitution was adopted that provided that "[t]he general assembly . . . shall provide a thorough system of general education, to be forever free to all children of the State, the expense of which shall be provided for by taxation or otherwise." Ga. Const. of 1868, Art. VI, Sec. I. This Constitution did not, however, create county boards of education to establish schools; instead, the General Assembly had authority to select any entity it

---

reasons given in the trial court's excellent 30-page order.

[14] Alternatively, the reader may skip to Division II below, which cites back to specific sections of this background division as they are relevant to specific aspects of the analysis.

[15] *McDaniel*'s review of the history of public education in Georgia is very useful and is consistent with the history presented in this dissent. However, the majority is wrong to call it "comprehensive," Maj. Op. at 266, because the *McDaniel* Court was focused on the funding of public education rather than the meaning of the "special schools" provision of the 1983 Constitution, which was adopted two years after *McDaniel* was decided.

wished to establish and operate the "general education" system.

In 1870, the General Assembly enacted the first comprehensive public school law. See *McDaniel*, 248 Ga. at 652; Ga. L. 1870, pp. 49-61. The 1870 act provided that each county would be a single school district managed by a county board of education, see Ga. L. 1870 at 52, and funded by a local ad valorem tax, see id. at 57, as well as a statewide common school fund, see id. at 60. The 1870 act also established the state board of education, which was given the authority to prescribe the textbooks and thereby set the curriculum for the State's schools, see id. at 49-50, and the position of state school commissioner (later renamed superintendent), who was granted the authority to prescribe regulations to be followed by local school officers and to equitably divide state revenue between the school districts, see id. at 51.

However, distinct from the statewide county school districts, the General Assembly also separately authorized — sometimes the word "chartered" is used — the creation of other school districts in specific counties and municipalities, as well as individual schools for blind children and deaf children. See Ga. L. 1872, p. 388 (setting forth the local law establishing the Board of Public Education for Bibb County); Ga. L. 1872, p. 456 (setting forth the local law establishing the Board of Education for Richmond County); Ga. L. 1870, p. 481 (setting forth the local law authorizing the City of Atlanta to establish a public school system); Ga. L. 1852, p. 4 (establishing Georgia Academy for the Blind); Ga. L. 1847, p. 94 (establishing Georgia School for the Deaf). In 1872, the General Assembly also revised the 1870 act to expressly acknowledge the existence of these schools separate from the statewide system of county board-controlled schools and to authorize the creation by the General Assembly of new "independent" schools.

> Nothing in this act shall be so construed as to prevent any city with a population greater than two thousand inhabitants, or any county under authority from the General Assembly of this State, from organizing a public school system, independent of this [statewide] system . . . .

Ga. L. 1872, pp. 64, 75. It should also be noted that the local school system appellants in this case (hereafter the "local systems") all agree that the schools for the blind and the deaf qualify as "special schools."

**B.** *1877 to 1945: The "Common" County Schools and the Growing Number of "Not Common" Schools and County Sub-Districts*

In 1877, the State adopted a new constitution. It provided that "[t]here shall be a thorough system of *common schools* for the

education of children in the elementary branches . . . , as nearly uniform as practicable, the expenses of which shall be provided for by taxation, or otherwise." Ga. Const. of 1877, Art. VIII, Sec. I, Par. I (emphasis added). The 1877 Constitution also provided that "[e]xisting local school systems shall not be affected by this Constitution. Nothing contained in section first of this article shall be construed to deprive schools in this State, *not common schools*, from participation in the educational fund of the State . . . ." Art. VIII, Sec. V, Par. I (emphasis added). This constitutional reference to schools created outside the statewide system of county schools as *"not common schools"* is an early indication that such schools were considered to be *"special* schools."

In addition, like the 1868 Constitution, the 1877 Constitution did not mention county "boards of education" or assign them the authority to establish and control local schools. Pursuant to the 1870 statute, county school boards may have done so to a large extent, but the General Assembly remained constitutionally free to assign that power to any entity it desired. Thus, as discussed further in Division II (C) below, the majority is simply incorrect when it claims that, since the 1877 Constitution, Georgia's constitutions have granted "local boards of education . . . the exclusive control over . . . general K-12 public education." Maj. Op. at 266. To the contrary, in 1906 the General Assembly enacted a law requiring every county board of education in Georgia to divide the county into school districts with clear boundary lines. See Ga. L. 1906, p. 66. These sub-county districts were authorized to raise taxes for their schools and were managed not by the county boards but by local trustees. See id. at 67-69.

Due to both "the tendency of cities and towns to secure charters from the legislature and to withdraw from the county system" and the 1906 law, which allowed the counties to create sub-districts that "fence[d] off the richest portion of the county," a "multiplicity of systems" arose by early in the last century. *McDaniel,* 248 Ga. at 655. In fact, at the time the 1945 Constitution was adopted, "two thousand school systems" existed in Georgia, Records of Constitutional Commission, 1943-1944, Vol. 1, p. 296, dramatically illustrating the lack of "exclusive" constitutional control over primary and secondary education by county school boards in the first half of the 20th Century. The independent school systems "dealt only with the state department [of education] and received their pro rata share of state funds directly," *McDaniel,* 248 Ga. at 655 — much like the commission charter schools that "secure charters from the legislature" and are funded directly by the State under the 2008 Act. Over time, however, the large number of independent schools and county sub-districts, established predominantly in cities and towns where

wealth was concentrated, led to great inequalities in school funding with rural county systems that had limited property value to tax. See id. at 641, 654-657.

The charter school appellees note another significant aspect of this period of our history. The 1877 Constitution was ratified as Reconstruction ended and Georgia's long and disgraceful era of Jim Crow began. Thus, immediately after the sentence establishing the "common schools" came a sentence making racial segregation in public education part of Georgia's fundamental law: "The schools shall be free to all children of the State, but separate schools shall be provided for the white and colored races." Art. VIII, Sec. I, Par. I. Over many decades that followed, all-white local school boards provided pitiful schools and resources to the African-American population that made up nearly half of their constituency. See generally Dorothy Orr, A History of Public Education in Georgia, Chapter XII (1950) (discussing the history of elementary and secondary education for African-Americans from the Civil War to 1950). For example, by 1910, in counties with an African-American population of 75% or greater, the local districts spent $1.61 per African-American student compared with $19.23 per white student. See id. at 316. Similarly, between 1902 and 1914, local districts built 78 high schools for white students, but in 1916 there was still only one four-year public high school for African-American students in the entire State. See id. at 319.

The State ultimately stepped in with efforts to mitigate (to some extent) the injustice the local districts were perpetrating on their African-American children. In 1911, the State Department of Education established the Division of Negro Education, which over time assumed "the responsibility for supervising and co-ordinating all agencies of Negro education." Orr at 323. By 1932, the Division supervised the education of 177,000 African-American students and 5,000 African-American teachers. See id. at 336. Conditions improved somewhat after 1920, when the State Department of Education developed a program to leverage the assistance provided by philanthropies, and more in 1937-1938 when the State reformed the public school system to provide "for a state system of free textbooks, a minimum term of seven months, and a minimum state salary schedule for all teachers." Id. at 342-343. This is hardly a story of "exclusive control over . . . general K-12 public education" by local school boards, Maj. Op. at 266 — and thankfully so.

C. *References to "Special Schools" in Georgia Statutory and Case Law*

The first references to "special schools" in Georgia law came during this period. References to "special schools" first appear in decisions by this Court about a century ago. These cases relied on the

general legislation enacted in the first decade of the 1900s, which provided for a uniform system of laying out school districts within counties, to overturn special acts creating new municipal "special school districts," in accordance with the constitutional rule that prohibits enactment of a special law where there is a general law on the same subject. See, e.g., *Vaughn v. Simmons*, 139 Ga. 210, 214-215 (76 SE 1004) (1913) (noting that "[s]everal efforts have been made to create special school districts inconsistently with the general school law" and invalidating a special act incorporating a portion of Pulaski County as "the town of Mitchell's District" with the sole municipal power of operating a school district); *James v. City of Blakely*, 143 Ga. 117 (84 SE 431) (1915) (invalidating a special law creating a "special school district" for the City of Blakely). In 1924 the Court of Appeals similarly referred to the local independent school system for the City of Abbeville as a "special school system." *Southern School Supply Co. v. Abbeville*, 34 Ga. App. 93, 100 (128 SE 231) (1924).

Two years later, the General Assembly enacted a statute, which continues in effect today, that used the term "special school" to refer to a school district established separate from a county school system. See Ga. L. 1926, Ex. Sess., p. 40, § 1, now OCGA § 20-2-370 (providing that municipal school districts that "operat[e] a system of public schools independent of the county school system" may "annul their special school law and become a part of the county school system" using certain procedures). See also *Upson County School Dist. v. City of Thomaston*, 248 Ga. 98, 98, 101 (281 SE2d 537) (1981) (discussing "a municipality operating an independent public school system" that was seeking to annul its "special school law" under what is now OCGA § 20-2-370). In the same vein, in 1940 this Court referred to a county school system that had been created by local law in 1872 as an "independent school system" and as one of the "series of special schools regulated and controlled by local laws," juxtaposing it with the general system of state-supported local schools. *State Bd. of Ed. v. County Bd. of Ed. of Richmond County*, 190 Ga. 588, 593 (10 SE2d 369) (1940). Likewise, in 1955 the Court of Appeals referred to a law establishing "an independent school system" for the City of Ashburn as a "special school law." *Searcy v. State of Ga.*, 91 Ga. App. 603, 607 (86 SE2d 652) (1955).

What is notable about all of these references — by the General Assembly, the Justices of this Court, and the Judges of the Court of Appeals — is that they all equate "special schools" to schools or school systems established separate from the statewide, county-based common school systems. *Not once* is there a suggestion that a "special school" is defined by its students or curriculum.

D. *1945 to 1960: Consolidation of School Creation in the Counties*

The 1945 Constitution reflected a major shift in authority over public schools to the county boards of education. The new Constitution grandfathered existing independent school systems, but it otherwise merged all local school districts in a county into one county-wide school district with an improved ad valorem tax system. The exclusive authority to operate each county school system was given to the county board of education, and the creation of new independent school systems was prohibited. See *McDaniel*, 248 Ga. at 642; *Veal v. Smith*, 221 Ga. 712, 714 (146 SE2d 751) (1966).[16]

But the pendulum seems to have swung too far in preventing the creation of new schools outside the control of an individual local system. In 1955, this Court held that the Thomas County Board of Education could not, under the 1945 Constitution, contract to build a new high school to be operated and governed jointly with the independent City of Thomasville Board of Education. See *Tipton v. Speer*, 211 Ga. 886, 886 (89 SE2d 633) (1955).

E. *1960 to 1966: "Area Schools, Including Vocational Trade Schools" Created Jointly by Local Systems*

Five years later, in 1960, the Constitution was amended to provide that "[a]ny two or more counties, or any two or more municipalities, or any county and municipality, or combination thereof may jointly establish *area schools, including vocational trade schools.*" Ga. Const. of 1945, Art. VII, Sec. VI, Par. I (d) (emphasis added). See Ga. L. 1960, p. 1259, § 1 (proposing this constitutional amendment); Ga. L. 1961, p. 756 (noting its ratification). Thus, while the Constitution still did not allow the creation of new independent school *systems* (a prohibition that continues to this day), it once again allowed the creation of individual schools outside the authority and control of a single local board of education, although only by joint agreement of the local districts affected.

---

[16] Thus, Art. VIII, Sec. V, Par. I of the 1945 Constitution provided:

Authority is granted to counties to establish and maintain public schools within their limits. Each county, exclusive of any independent school system now in existence in a county, shall compose one school district and shall be confined to the control and management of a County Board of Education.

Art. VIII, Sec. VII, Par. I provided:

Authority is hereby granted to municipal corporations to maintain existing independent school systems, and support the same as authorized by special or general law . . . . No independent school system shall hereafter be established.

And Art. VIII, Sec. XII, Par. I provided:

The fiscal authority of the several counties shall levy a tax for the support and maintenance of education not less than five mills nor greater than fifteen mills (as recommended by the County Board of Education) upon the dollar of all taxable property in the county located outside independent school systems.

**F. *1966 to 1976: "Area Schools, Including Special Schools Such as Vocational Trade Schools, Schools for Exceptional Children, and Schools for Adult Education" Created by the General Assembly with Local Voter Approval***

In 1966, Article VIII, Section IX of the 1945 Constitution was replaced by amendment. See Ga. L. 1966, pp. 1026, 1026-1027, § 1 (proposing this constitutional amendment); Ga. L. 1967, p. 1127 (noting its ratification). The 1966 Amendment authorized the General Assembly to consolidate multiple county or independent school systems into an "area school district," pursuant to special or local law and with the approval of the voters in the school systems affected. See Art. VIII, Sec. IX, Par. I.

The 1966 Amendment also replaced the 1960 Amendment to Article VII, Section VI, Paragraph I with a new provision regarding the creation of individual "area schools," which contained the first constitutional use of the term "special schools."

> The board of education of any county, area school district or independent school system, or any combination thereof, may establish, pursuant to local law enacted by the General Assembly, one or more area schools, including *special schools such as vocational trade schools, schools for exceptional children, and schools for adult education,* in one or more such political subdivisions; provided, however, that the establishment and operation of such schools pursuant to such local law, and any subsequent amendments thereof, shall be first approved by a majority of the voters thereon in each of the school districts or systems affected thereby in separate referendums . . . . The government, powers and duties of boards of education participating in the establishment or operation of such schools and respecting such schools shall be defined in the local law authorizing the same, and such participating political subdivisions shall be authorized to incur bonded indebtedness and to require the levy of school tax funds required for the establishment and operation of such schools in such amount and manner as shall be provided in such local law . . . . *Special schools,* including vocational trade schools, established prior to the adoption of this amendment under former Subparagraph (d) of Article VII, Section VI, Paragraph I of the Constitution shall not be affected by this amendment . . . .

See Ga. L. 1966, pp. 1029-1030, § 3 (emphasis added).

The text of the 1966 Amendment makes several points clear about special schools at that time. "Special schools" were a type of

"area school" and included — at a minimum — "vocational trade schools, schools for exceptional children, and schools for adult education." A special school could span more than one political subdivision and thus be beyond the jurisdiction of a single local school board. Indeed, the General Assembly, by local law, would determine the powers of the local boards involved in establishing and operating a special school. But the General Assembly could not create such a school on its own; the voters in the local districts affected would have to approve the school, after which local school tax funds and bond debt could be used in support of the special school.

The 1976 Constitution generally carried forward the public school scheme of the 1945 Constitution, as amended in 1960 and 1966, including incorporating the 1966 "area schools" language virtually verbatim as Article VIII, Section IX, Paragraph I.

## G. *The 1983 Constitution: "The General Assembly May Provide by Law for the Creation of Special Schools in Such Areas as May Require Them"*

Our current Constitution, which took effect in 1983, again maintained the basic public education scheme of county, area, and pre-existing independent school *systems*, along with the prohibition on establishing new independent systems. See Art. VIII, Sec. V, Par. I. Local boards of education were again granted the authority to "establish and control public schools within their limits," id., and to manage and control their school systems. Art. VIII, Sec. V, Par. II.

And the 1983 Constitution again separately authorized the General Assembly to create "special schools":

> The General Assembly may provide by law for the creation of special schools in such areas as may require them and may provide for the participation of local boards of education in the establishment of such schools under such terms and conditions as it may provide; but no bonded indebtedness may be incurred nor a school tax levied for the support of special schools without the approval of a majority of the qualified voters voting thereon in each of the systems affected.

Art. VIII, Sec. V, Par. VII (a).

However, the 1983 provision was different than its predecessors in several important respects. First, the language "areas schools, including special schools" became "special schools in such areas as may require them." Second, the three specific examples of special schools listed in the 1966 Amendment and the 1976 Constitution were deleted.

In addition, the General Assembly was granted the authority to create special schools unilaterally — authority it had not had, at least expressly, since the 1945 Constitution prohibited the creation of any new independent school systems. Although the General Assembly *may* still provide for local boards of education to participate in the creation of special schools, that is no longer required. Similarly, special schools can now be created without the approval of voters in the school districts affected, although the General Assembly cannot draw on local school taxes or bonds to finance special schools without local voter approval.

**H.** ***The 1993 and 1998 Charter School Acts and the Attorney General Opinions Concluding That the "Special Schools" Provision Authorizes the General Assembly to Create State Chartered Schools***

A charter school is a public school that operates under the terms of a charter, which is a performance based contract between the school and the relevant government entity, instead of under all of the statutes and rules that ordinarily govern public education. See OCGA § 20-2-2062 (1) (defining the term "charter"); OCGA § 20-2-2065 (a) (providing that charter schools are exempt from state laws and rules governing public education, except as otherwise provided in the education title of the Code or in a charter, and that in exchange for this waiver, charter schools agree to meet or exceed the performance goals included in their charters); Ga. Comp. R. & Regs. r. 160-4-9-.04 (setting forth the rules of the State Board of Education regarding charter schools).

In 1993, the General Assembly authorized the creation of the first public charter schools in Georgia with the enactment of OCGA § 20-2-255. See Ga. L. 1993, p. 1440. The 1993 Act permitted an existing local school under the management and control of a local board of education to become a charter school if it obtained approval from both its local board of education and the State Board of Education. See id. at 1442-1444.

Five years later, in the Charter Schools Act of 1998, the General Assembly repealed the 1993 Act, see Ga. L. 1998, pp. 1080-1081, and enacted a more comprehensive scheme for charter schools. See OCGA § 20-2-2060 et seq. The 1998 Act authorizes the creation of both "local charter schools" and "state chartered special schools." OCGA § 20-2-2062 (7), (16). A "local charter school" is a school that "operat[es] under the terms of a charter between the charter petitioner and the local board [of education]," OCGA § 20-2-2062 (7), and is "[s]ubject to the control and management of the local board of the local school system in which the charter school is located." OCGA § 20-2-2065 (b) (2). A "state chartered special school," on the other hand, is a "charter school created as a special school that is

operating under the terms of a charter between the charter petitioner and the state board." OCGA § 20-2-2062 (16). The 1998 Act specifically invokes the 1983 Constitution's "special schools" provision, defining a "special school" as "a school whose creation is authorized pursuant to Article VIII, Section V, Paragraph VII of the Constitution." OCGA § 20-2-2062 (13). The funding mechanism for "state chartered special schools" is set forth in OCGA § 20-2-2068.1 (d).

Three state charter schools established under the 1998 Act retain that status today, including the Odyssey School, whose Georgia Cyber Academy provides on-line education for students throughout the State in grades K-10. See http://www.k12.com/gca/ (Georgia Cyber Academy website); http://www.doe.k12.ga.us/pea_charter.aspx (Georgia Department of Education web page containing a list of all Georgia charter schools). Of note, there are no published court opinions in which the 1998 Act or the creation of these schools has been challenged as unconstitutional, nor did the local systems expressly challenge them in this litigation — although the majority opinion will unfortunately have the effect of rendering them unconstitutional.[17]

On the other hand, in two opinions, one unofficial and one official, the Attorney General concluded that the General Assembly has expansive power to create "special schools," including state charter schools pursuant to the 1998 Act. See 2001 Op. Atty. Gen. 2001-9 (concluding that the 1983 Constitution's "special schools" provision authorizes the General Assembly to create state charter schools pursuant to the 1998 Act); 1997 Op. Atty. Gen. U97-8 (concluding that the 1983 "special schools" provision authorizes the General Assembly to create state charter schools without the approval of the local board of education for the school system in which the charter school would be located). See also 1998 Op. Atty. Gen. U98-2 (concluding that the 1983 Constitution gives the General Assembly "specific authority to set up whatever kind of structure it deems appropriate for the creation of special schools").

## I. *The 2008 Charter Schools Commission Act*

This case involves the Charter Schools Commission Act of 2008. See OCGA § 20-2-2080 et seq. Experience under the 1998 Act led to concerns that local school boards would not approve charter school petitions and that funding for the alternative, the state charter

---

[17] The Georgia Cyber Academy was originally part of the Odyssey School, a brick-and-mortar school in Coweta County that in 2001 became the first state charter school approved in Georgia. The two schools recently had separate petitions approved so that they could become commission charter schools as of July 1, 2011 – or so they thought, there being no such schools after today's decision.

schools, was too limited. See Review of Selected 2008 Georgia Legislation, 25 Ga. St. U. L. Rev. 47, 51-52 (Fall 2008) (noting that 26 of the 28 charter school petitions submitted in Georgia were denied in 2007). After extensive hearings, floor debate, and amendments, the 2008 Act passed by a vote of 114-40 in the House of Representatives and 30-21 in the Senate. See id. at 50-67.

The 2008 Act opens with the following legislative findings and statement of intent:

(a) The General Assembly finds that:

(1) Charter schools are a critical component in this state's efforts to provide efficient and high-quality schools within this state's uniform system of public education;

(2) Charter schools provide valuable educational options and learning opportunities while expanding the capacity of this state's system of public education and empowering parents with the ability to make choices that best fit the individual needs of their children; and

(3) The growth of charter schools in this state has contributed to enhanced student performance, greater efficiency, and increased parental satisfaction.

(b) It is the intent of the General Assembly that:

(1) There be established a state-level commission whose primary focus is the development and support of charter schools in order to better meet the growing and diverse needs of some of the increasing number and array of charter schools in this state and to further ensure that charter schools of the highest academic quality are approved and supported throughout the state in an efficient manner; and

(2) New sources of community support from cosponsors should be authorized to participate in developing and supporting charter schools, with the goal of maximizing access to a wide variety of high-quality educational options for all students regardless of disability, race, or socioeconomic status, including those students who have struggled in a traditional public school setting.

OCGA § 20-2-2080.

The act created the seven-member Georgia Charter Schools

Commission, appointed by the State Board of Education from recommendations by the Governor (for three commissioners), the President of the Senate (two), and the Speaker of the House (two). See OCGA § 20-2-2082 (a), (b). Commissioners must hold at least a college degree and should be "a group of diverse individuals representative of Georgia's school population who [have] experience in finance, administration, law, education, public school teaching, and school governance." OCGA § 20-2-2082 (b).

The Commission's primary function is to develop "commission charter schools." A commission charter school is expressly defined in terms of the 1983 Constitution's "special schools" provision as a "charter school authorized by the commission pursuant to this article [of the Education Code] whose creation is authorized as a special school pursuant to Article VIII, Section V, Paragraph VII of the Constitution." OCGA § 20-2-2081 (2). The Commission is charged with, among other responsibilities, approving or denying petitions for commission charter schools according to rules and regulations established by the State Board of Education. See OCGA § 20-2-2083 (a) (1).

The funding mechanism for commission charter schools is set forth in OCGA § 20-2-2090; it is much less favorable for local school systems than the funding mechanism for the state charter schools created under the 1998 Act, as the local systems receive reduced state and federal funding in proportion to the number of students residing in their districts that choose to attend commission charter schools. Because the same "special school" arguments can be made, but have not been made, against the 1998 Act as against the 2008 Act, it is apparent that this funding difference is what motivated this lawsuit and the efforts of the local systems to have the Commission Charter Schools Act deemed unconstitutional. But as the trial court held and I fully agree, there is nothing unconstitutional about the funding scheme set up by the 2008 Act. Because the majority evidently can find no traction in the local systems' attack on the funding scheme (or in the many other arguments the appellants raise) as the ground for striking down the statute, the majority must rely on the "special schools" argument, which has the consequence of also nullifying any state charter schools established under the 1998 Act.

## J. The Three Commission Charter School Appellees

The three appellee schools in this case are Ivy Preparatory Academy, Charter Conservatory for Liberal Arts and Technology ("CCAT"), and Heron Bay Academy — the first three commission charter schools approved in Georgia. Each of the schools first petitioned its local district to operate as a local charter school under the 1998 Act, but their petitions were all denied. Before 2008, Ivy

Prep and CCAT each obtained approval to operate as a state charter school. After the 2008 Act took effect, Ivy Prep, CCAT, and Heron Bay each obtained approval from the Commission to operate as a commission charter school.

Ivy Prep is located in Gwinnett County, and its charter permits it to enroll students from Gwinnett and DeKalb Counties and to continue to enroll the students from outside those two counties who were enrolled when it became a commission charter school. The record indicates that Ivy Prep has a total of about 300 students from ten school districts, including Gwinnett, DeKalb, and Atlanta. Ivy Prep is a single-gender school that "provides a rigorous, college preparatory program for young women," ultimately in grades 6 to 12, including "an extended day, week, and year educational program and . . . two hours of English/language arts and mathematics instruction on a daily basis." Ivy Prep's charter requires its students to perform at a higher level than their peers in the Gwinnett County Public Schools System in reading, math, social studies, and science. Ivy Prep's student population is about 68% African-American, 11% Asian, 10% Hispanic, 6% Caucasian, and 5% multiracial. Nearly 40% of the students come from low income families. Ivy Prep's students have outscored their peers in surrounding school systems on standardized testing, sometimes significantly, and have surpassed "adequate yearly progress" standards, enabling the school to obtain federal Title I funds.

CCAT is located in Bulloch County, and its charter permits it to enroll students from Bulloch County and to continue to enroll the students from other districts who were enrolled when it became a commission charter school. CCAT has about 1,100 students from six school districts, including Bulloch and Candler. Also serving students in grades 6 to 12, CCAT offers "a year round program with multi-age, student-centered classrooms featuring pedagogy that is based on constructivist and multiple intelligence learning." To meet the performance objectives in its charter, CCAT's middle school students must meet or exceed the mean and median scores of their peers statewide on the CRCT exam in each content area; its high school students must perform similarly well on statewide high school graduation, writing, and end-of-course tests. About 41% of CCAT's students come from low income families, and special education students constitute 14% of the school. CCAT has an average graduation rate of 92%, placing it in the top three schools in Georgia over the last seven years. The school has also been honored by the Georgia Department of Education multiple times for having one of the highest graduation rates for students with disabilities, and it has been a Title I Distinguished School for the last seven years.

Heron Bay is located in Spalding County and was scheduled to

begin operating during the 2011-2012 academic year with students from the Griffin-Spalding and Henry County School Districts. It was to open as a K-6 grade school offering "an extended day and extended school that will incorporate foreign language instruction for all students in all grade levels beginning in Kindergarten." Its charter required its students to perform above their peers in the Henry and Spalding County school systems' non-charter schools on standardized tests and to substantially increase test scores each year. Like all of the state charter and commission charter schools, any student who resides in its area may apply to enroll in Heron Bay, with a random selection process ensuring an equal chance of admittance, without discrimination on any basis that would be illegal if used by a local school system, and in full compliance with state and federal laws regarding education of students with disabilities and other special education needs and English language learners. See OCGA § 20-2-2066 (b)-(c); Ga. Comp. R. & Regs. r. 160-4-9-.04 (5) (a) (5) (v), (vi), (x) and (5) (a) (7) (iii).

## K. *The Federal "Race to the Top" Program*

With the support of President Obama and the United States Department of Education, in February 2009, Congress enacted a law providing $4.35 billion for the

> Race to the Top Fund, a competitive grant program designed to encourage and reward States that are creating the conditions for education innovation and reform; achieving significant improvement in student outcomes, including making substantial gains in student achievement, closing achievement gaps, improving high school graduation rates, and ensuring student preparation for success in college and careers; and implementing ambitious plans in four core education reform areas.

http://www2.ed.gov/programs/racetothetop/executive-summary.pdf., p. 2. One of the criteria for the grants is "[e]nsuring successful conditions for high-performing charter schools and other innovative schools." Id. at p. 11. Among other things, this criterion includes consideration of the extent to which (1) "[t]he State has a charter school law that does not prohibit or effectively inhibit increasing the number of high-performing charter schools," (2) the State has laws that "encourage charter schools that serve student populations that are similar to local district student populations, especially relative to high-need students," and (3) the State's charter schools receive "equitable funding compared to traditional public schools, and a commensurate share of local, State, and Federal revenues." Id.

After an unsuccessful first application, Georgia's second applica-

tion for Race to the Top funds, submitted in June 2010, highlighted in bold print the enactment of the 2008 Charter Schools Commission Act, explaining that it was designed "to ensure that charter school applicants have an opportunity to apply to more than one authorizer." http://www2.ed.gov/programs/racetothetop/phase2-applications/georgia.pdf. See also Democrats for Education Reform, Race to the Top Series, #5: Growing Innovative Charter Schools, p. 4 (June 17, 2009) ("*Race to the Top* states should have multiple charter school authorizers, so that no one entity can bottleneck the charter school approval process."). One of the application reviewers specifically noted Georgia's "strong state Charter School Commission," http://www2.ed.gov/programs/racetothetop/phase2-applications/comments/georgia.pdf, p. 8, and all reviewers gave Georgia a perfect score on this point. See http://www2.ed.gov/programs/racetothetop/phase2-applications/score-sheets/georgia.pdf. Georgia was ultimately selected to receive $400 million in Race to the Top funding.

## L. *A Sense of Context: State Chartered Schools Are Less Than One Percent of Georgia's K-12 Public Education System*

Since these lawsuits were filed in 2009 and 2010, the Commission has approved several more commission charter schools and state charter schools converting to commission charter school status. See http://www.doe.k12.ga.us/pea_charter.aspx. This long but important background discussion will end with a few numbers that are useful in evaluating the majority's claim that commission charter schools "duplicate the efforts of local boards of education in establishing and maintaining general K-12 schools." Maj. Op. at 266. There are nearly 2,300 individual public schools in Georgia, serving nearly 1.7 million students. See http://app3.doe.k12.ga.us/ows-bin/owa/fte_pack_enroll-grade.display_proc; http://app3.doe.k12.ga.us/ows-bin/owa/fte_pack_school_count.display_count. Thirteen years after the 1998 Act and three years after the 2008 Act, fewer than 1% of those schools are state-chartered pursuant to the General Assembly's "special schools" authority, and fewer than 1% of public school students attend those schools.

## II. *Constitutional Analysis*

[A]ll presumptions are in favor of the constitutionality of an act of the legislature, and . . . before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this [C]ourt must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be consti-

tutional until the contrary appears, . . . the burden is on the
party alleging a statute to be unconstitutional to prove it.

*Dev. Auth. of DeKalb County*, 286 Ga. at 38 (citations and punctuation omitted). The majority recites these words, see Maj. Op. at 268, but it fails to apply them, along with other basic principles of constitutional interpretation, including the principle that, because this case involves no First Amendment overbreadth claim, the local systems' facial challenge to the 2008 Act can succeed only " 'by establish(ing) that no set of circumstances exists under which the (statute) would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that the statute lacks a plainly legitimate sweep.' " *Blevins v. Dade County Bd. of Tax Assessors*, 288 Ga. 113, 118 (702 SE2d 145) (2010) (citation omitted).

## A. *The Ordinary Meaning of "Special Schools"*

The question that controls this case is what makes a public school "special" as that term is used in Article VIII, Section V, Paragraph VII of the 1983 Constitution.

> In interpreting the provisions of a constitution, it is to be presumed that the words therein used were employed in their natural and ordinary meaning; and, where a word has a technical as well as a popular meaning, the courts will generally accord to it its popular signification, unless the nature of the subject indicates or the context suggests that it is used in a technical sense. Constitutions are the result of popular will, and their words are to be understood ordinarily in the sense they convey to the popular mind.

*Clarke v. Johnson*, 199 Ga. 163, 164-165 (33 SE2d 425) (1945) (citation omitted). Accord *Williamson v. Schmid*, 237 Ga. 630, 632 (229 SE2d 400) (1976).

### 1. *Dictionary Meanings*

The first place that we usually look to determine the ordinary meaning of words is a good dictionary. See *Clarke*, 199 Ga. at 165; *Williamson*, 237 Ga. at 632. That is what the trial court did in this case, consulting Webster's New World College Dictionary, which says that "special" means simply "of a kind different from others," followed by similar definitions that give the term a broad meaning juxtaposed to antonyms like "common," "general," or "ordinary." Accord Webster's Third New International Dictionary (1967) (listing as the first definition of "special": "distinguished by some unusual quality: UNCOMMON . . . .").

As discussed in Division I (I)-(J) above, commission charter schools — and the three appellee schools in particular — are

different from "common," "general," or "ordinary" K-12 public schools in Georgia in multiple ways. Most significantly, each charter school is individually created by the Commission, exercising authority delegated by the General Assembly. They are established outside a local school system, pursuant to an individualized, performance-based contract, and the schools are not required to abide by all of the statutes and regulations that ordinarily govern public education. The charter schools are also different from ordinary public schools in the way they are managed, overseen, and funded.

Tellingly, the majority gets around to mentioning the "natural and ordinary meaning" principle of constitutional interpretation only as a "final" consideration in its opinion, see Maj. Op. at 271 — and even then it studiously avoids reference to any dictionary or other source of ordinary understanding, because those sources demonstrate that "special" just means different from the norm. The majority contends that "special" in this context means "special student body" or "special curriculum." Id. at 271. The first of these restrictive definitions is also proposed by the local systems, who argue that "special schools" has the narrow connotation of "special needs schools," "special education schools," or "special student schools."

It would have been easy, of course, for the drafters of the 1983 Constitution (or the 1966 Amendment or 1976 Constitution, for that matter) to include such limiting adjectives, if such a limitation were intended. But they did not do so. The local systems and the majority say that we need to look to other principles of interpretation to find the limited meaning, and we will examine and reject those arguments below. But it is important at the outset to identify a gaping hole in both the local systems' and the majority's textual arguments.

### 2. The Local Systems' Incomplete Restrictive Meaning and the Majority's Illogical Restrictive Meanings

Whatever "special schools" means in the 1983 Constitution, no one has argued that it is *narrower* than the three examples that were listed in the 1966 Amendment and 1976 Constitution and then deleted in 1983 — "vocational trade schools, schools for exceptional children, and schools for adult education."[18] Schools for exceptional

---

[18] These three types of "special schools" appear to be illustrative, not limiting, given that they were introduced by the word "including." To the extent that these examples might have operated to limit the scope of "special schools," however, they were deleted in 1983 and the presumption is that, when limiting language is removed from a law, the law should no longer be read as including such limits. See *Transp. Ins. Co. v. El Chico Restaurants*, 271 Ga. 774, 776 (524 SE2d 486) (1999) (holding that the legislature's deletion of limiting language when amending a statute must be presumed to be "a matter of considered choice" so that the law cannot be read to maintain the limitation at issue).

students and (perhaps) schools for adult education may serve students with special educational needs. The problem for the local systems "special needs" interpretation is that vocational trade schools are defined not by a type of student but rather by the curriculum or type of subjects taught — training for the skilled trades instead of, for example, preparation for college. See OCGA § 20-2-152 (a) (not including adult students or vocational students in the listing of the types of students with "special education needs"). Yet "vocational trade schools" undeniably are "special schools"; indeed, the phrase "special schools" in our Constitution traces back not to a focus on students with special needs like the deaf and blind, but to the ability to create "area schools, including vocational trade schools," beyond the bounds and authority of individual local districts. See Division I (E) above. Perhaps recognizing this serious shortcoming of their interpretation, the local systems conspicuously avoid discussing "vocational trade schools" in their arguments.

But at least the local systems are respectful of the English language; the majority, searching for a way around this problem, is not. In theory, the word "special," as used to modify "schools," could have the limited meaning "special student body." Or it could have the limited meaning "special curriculum." But students and curricula are two very different things — and they are only two of the many characteristics that could make a school "special." A single adjective used in a single phrase does not normally have two (but only two) limited and different meanings. Instead, writers trying to convey such dual and limited meanings would be expected to use the additional modifiers the majority inserts into our Constitution today.

Trying to gloss over this defect, several portions of the majority opinion elide the two distinct meanings, indicating that a "special school" must have *both* a distinctive student body *and* a distinctive curriculum. See Maj. Op. at 269, 271. But that approach runs into the same problem as the local systems' approach. A school for exceptional students (like the disabled or the gifted) might have unusual students, but teach the standard curriculum; a vocational trade school might have an unusual curriculum, but ordinary students. Both types of schools, however, are unquestionably described in our Constitution with the single adjective "special." This single adjective must have one meaning and must encompass, at a minimum, the diverse types of schools that everyone agrees are "special." There is such a definition — schools are "special" if they are created by the General Assembly separate from the "common" schools established by the local school systems.

The majority's position that what defines a "special school" is its unique students or curriculum, and that what entity creates the school is irrelevant, see Maj. Op. at 274, raises another problem too.

Many large local school systems have established schools attended only by special needs students; moreover, a local school system could create, perhaps with approval from the State Board of Education or other local districts but without any action by the General Assembly, a local school that is as unique in its student body or the subjects it teaches as any school that could ever be created by the General Assembly or the Charter Schools Commission. Under our Constitution, what would such a school be called? Under the majority's interpretation, the school's unique student body and curriculum would make it a "special school." But our Constitution expressly authorizes only the General Assembly to create a "special school." In my view, a local school for special students is simply another local school, because a "special school" is defined not by its student body or the subjects it teaches, but by its creation by the General Assembly outside of the common county school system. My view, unlike the majority's, is consistent with the ordinary meaning of the words used in our Constitution.

### 3. *The Absence of "Charter Schools" in 1983*

The local systems also contend that because no "charter schools" existed in 1983, commission charter schools cannot possibly come within the meaning of "special schools" as used in the 1983 Constitution. This contention was pressed by the local systems in their initial briefs, although they backed away from it in the briefs they submitted after oral argument and the majority does not give it any credence. That is because it is baseless. The *application* of the words used in a Constitution is not restricted to things and circumstances that existed at the time it was ratified. Otherwise, to give just a couple of the more obvious examples, the First Amendment to the United States Constitution would not apply to "speech" communicated electronically or digitally or to Jehovah's Witnesses, Seventh-Day Adventists, or the Church of Jesus Christ of Latter Day Saints, none of which yet existed as "religions" in 1791, when the Bill of Rights took effect. Thus, this Court has explained that a constitutional attack on a statute will fail " 'if upon analysis it appears that the only novelty in the legislation is that approved principles are applied to new conditions.' " *Williamson v. Housing Auth. of Augusta*, 186 Ga. 673, 693 (199 SE 43) (1938) (citation omitted).

The proper standard for applying old constitutional words to new circumstances was set forth in *Collins v. Mills*, 198 Ga. 18 (30 SE2d 866) (1944), in considering whether lumber qualified as a "farm product" as that phrase was used in a 1912 constitutional amendment:

> A provision of the constitution is to be construed in the sense in which it was understood by the framers and the

people at the time of its adoption. Accordingly, the amendment of 1912 means now precisely what it meant at that time. The business of farming, however, may change both as to method and as to things produced, and changes in the latter respect may from time to time add new crops to the catalogue of farm products. In such case, the exemption would apply to the new products, as well as to the old, and would do so, even though the new products may have been entirely unknown, and hence not specifically within the minds of the people at the time such constitutional provision was adopted. This would involve only an application of the same constitution to new conditions arising by natural processes, and would not mean that the constitution itself had been changed.

Id. at 22. The question, therefore, is not whether the people of Georgia who framed and ratified the 1983 Constitution contemplated the existence of "charter schools," but rather whether schools that are created by the General Assembly outside the local school systems through individual charters, and that differ from local schools in numerous ways, could come within the meaning of "special schools" as citizens in 1983 understood that term — starting with the ordinary meaning of the words used.

## B. *The Constitutional Context*

We should not stop with the dictionary definitions of isolated words, however, because it is important to view the words in the context of the legal document in which they appear — another indication of meaning available to any drafter of or citizen voting to ratify a Constitution. See *Clarke*, 199 Ga. at 164. One aspect of context is "[t]he presumption . . . that the same meaning attaches to a given word or phrase wherever it occurs in a constitution." Id. Our current Constitution uses the adjective "special" about 19 times, always, it appears, with its ordinary meaning of simply different from the regular or general thing to which the "special" thing is being compared. See, e.g., Ga. Const. of 1983, Art. II, Sec. II, Par. V (discussing vacancies created when elected officials qualify for another office "in a general primary or general election, or special primary or special election"); Art. III, Sec. V, Par. XII (involving rejected bills being proposed again "during the same regular or special session" of the General Assembly).

In particular, the "special schools" concept seems analogous to the longstanding "special legislation" provision, which deals with the relationship between laws that apply generally to the entire State and laws that are specific and limited. See Art. III, Sec. VI, Par.

IV (a) ("Laws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law . . . ."). As discussed in Division I (C) above, in the early 1900s, this Court applied the "general law" provision to negate the General Assembly's efforts to create, by special and local laws, new school districts within counties, because there were general laws establishing the common county school systems and their school districts. See, e.g., *Vaughn*, 139 Ga. at 214-217. What allows the General Assembly to create schools outside the general county school systems today is the provision of the 1983 Constitution granting the Legislature the specific authority to create "special schools."

Analysis of context also includes the "concepts of expressio unius est exclusio alterius (the expression of one thing implies the exclusion of another) and expressum facit cessare tacitum (if some things are expressly mentioned, the inference is stronger that those not mentioned were intended to be excluded)." *Goddard v. City of Albany*, 285 Ga. 882, 884 (684 SE2d 635) (2009). The majority's result is premised on its claim that the constitutional provision stating that "[a]uthority is granted to county and area boards of education to establish and maintain public schools within their limits," Ga. Const. of 1983, Art. VIII, Sec. V, Par. I, gives local districts the "*exclusive* right to establish and maintain" general K-12 public schools. Maj. Op. at 266 (emphasis added). But the Constitution does not say that local boards have "exclusive" authority over schools, even though the drafters of the 1983 Constitution undeniably knew how to use that modifier when exclusivity was intended. See, e.g., Art. VI, Sec. VI, Par. II (granting this Court "exclusive appellate jurisdiction" over certain types of cases). Most strikingly, the *immediately preceding section* of the Constitution's Education Article states that "[t]he board of regents shall have the *exclusive* authority to create new public colleges, junior colleges, and universities in the State of Georgia, subject to approval by majority vote in the House of Representatives and the Senate." Art. VIII, Sec. IV, Par. I (b) (emphasis added).

This broader constitutional context weighs strongly against the majority's position, and so the majority utterly ignores it. It discusses only the narrow context of the particular constitutional section at issue. See Maj. Op. at 266-268. That section is appropriate to consider — but it also does not support the majority's position. The majority correctly says that the "special schools" provision of Article VIII, Section V, Paragraph VII (a) of the 1983 Constitution

must be read in conjunction with Paragraph I of that section, which states in full:

### School systems continued; consolidation of school systems authorized; new independent school systems prohibited.

Authority is granted to county and area boards of education to establish and maintain public schools within their limits. Existing county and independent school systems shall be continued, except that the General Assembly may provide by law for the consolidation of two or more county school systems, independent school systems, portions thereof, or any combination thereof into a single county or area school system under the control and management of a county or area board of education, under such terms and conditions as the General Assembly may prescribe; but no such consolidation shall become effective until approved by a majority of the qualified voters voting thereon in each separate school system proposed to be consolidated. No independent school system shall hereafter be established.

This provision is indeed illustrative, as is Paragraph II, which provides that *"[e]ach school system* shall be under the management and control of a board of education, the members of which shall be elected as provided by law," and Paragraph III, which provides that "[t]here shall be a school superintendent *of each system* appointed by the board of education who shall be the executive officer of the board of education." (Emphasis added.)

Paragraph VII (a), by contrast, reads:

### Special schools.

(a) The General Assembly may provide by law for the creation of special schools in such areas as may require them and may provide for the participation of local boards of education in the establishment of such schools under such terms and conditions as it may provide; but no bonded indebtedness may be incurred nor a school tax levied for the support of special schools without the approval of a majority of the qualified voters voting thereon in each of the systems affected. Any special schools shall be operated in conformity with regulations of the State Board of Education pursuant to provisions of law. The state is authorized to expend funds for the support and maintenance of special schools in such amount and manner as may be provided by law.

Read in context, Paragraphs I-III of this section of the Constitution plainly create a public education scheme in which every county, as well as every existing area and independent school *system*, has an elected board of education and a school superintendent who are charged with establishing, maintaining, managing, and controlling the public schools in their respective jurisdictions (limits). There is no restriction on the types of students these schools can serve or the types of subjects these schools can teach. The General Assembly and the local school systems have very limited authority to alter the *school system* structure; no new independent school systems can be established, and no consolidation of existing systems can be accomplished except by act of the General Assembly approved by the voters of the affected systems.

But there is something else too. There is in Paragraph VII the grant of authority to the General Assembly to create not new school *systems* but new *schools* — "special schools in such areas as may require them." The General Assembly "may" provide for local boards to participate in establishing such schools, but it is not required to do so. Indeed, there is no requirement of local involvement of any kind, with the caveat that local school taxes and bond debt cannot be used to support a special school without local voter approval. Unlike with the school systems, there is no provision for these schools to have a school board or school superintendent, or to be managed or controlled by any local board; instead, special schools are to be operated under regulations issued by the State Board of Education. And just like the public schools "establish[ed] and maintain[ed]" by the local school systems, Paragraph VII places no restriction on the types of students these "special schools" can enroll or the types of subjects these schools can teach.

So what is most fundamentally different — "special" — about the "special schools"? The text and context give no reason to think that it is their student bodies or the subjects they teach those students. What makes them unusual is that "special schools" can be created by the General Assembly *independent of* the local school systems, separate from the schools in those systems and the control and management of their local boards and superintendents. This meaning of "special schools" was indeed indicated as far back as the 1877 Constitution, which used the term "not common schools" to refer to the schools the General Assembly created by special or local law outside the scheme of "common schools" that were established in every county. See Division I (B) above. To argue against this meaning of "special schools," the majority must depart from the constitutional text and context and natural and ordinary meaning and venture into constitutional history and "technical meaning." But those ventures are no more successful.

## C. *Constitutional History*

The majority's analysis turns on its assertion that "[t]he constitutional history of Georgia could not be more clear that, as to general K-12 public education, local boards of education have the exclusive authority to fulfill one of the 'primary obligation[s] of the State of Georgia,' namely, '[t]he provision of an adequate public education for its citizens.' " Maj. Op. at 266 (quoting Ga. Const. of 1983, Art. VIII, Sec. I, Par. I). The majority relies primarily on the language of Article VIII, Section V, Paragraph I, quoted in the previous subdivision, which, the majority alleges, "continues the line of constitutional authority, unbroken since it was originally memorialized in the 1877 Constitution of Georgia, granting local boards of education the exclusive right to establish and maintain, i.e., the exclusive control over, general K-12 public education." Maj. Op. at 266. The claim that the Georgia Constitution has provided for local school boards to exercise "exclusive control of general K-12 public schools" for well over a century is repeated over and over. Given the majority's dependence on constitutional history, it is remarkable how little support the majority identifies for its claims. In truth, the majority's claims are at odds with the actual constitutional history of this State.[19]

To begin with, the majority's assertion that "local boards of education" were given exclusive authority over public schools under our constitutions beginning in 1877 is simply inaccurate. The 1877 Constitution contains no mention of local school boards.[20] Indeed, it appears that local — county — school boards are first mentioned in the 1945 Constitution.

Moreover, while county and independent school boards have existed since the creation of local school systems, and traditionally have been granted substantial authority and autonomy, that is largely a matter of legislative policy, not constitutional dictate. The 1877 Constitution stated that the "system of common schools" must be "as nearly uniform as practicable," Art. VIII, Sec. I, Par. I, a directive that would be senseless if the dozens of county school systems had "exclusive control" to organize and operate their

---

[19] I recognize the possibility that I may have missed some relevant piece of the historical record. But I have at least tried to cite specific materials from our constitutional history; moreover, because legislation is presumed to be valid, it is the majority that must demonstrate that our constitutional history supports its finding that the Commission Charter Schools Act is "clearly and palpably" unconstitutional.

[20] The 1877 Constitution did include a taxation provision allowing the General Assembly to grant to "*counties*, upon the recommendation of two grand juries, and to *municipal corporations*, upon the recommendation of the corporate authority, to establish and maintain public schools in their respective limits, by local taxation . . . ." Art. VIII, Sec. IV, Par. I (emphasis added).

schools without any statewide regulation. And since 1870, Georgia has had a State Board of Education and a State School Commissioner (or Superintendent) with broad authority to regulate primary and secondary public education pursuant to laws enacted by the General Assembly. See, e.g., Division I (A) above; Ga. Const. of 1983, Art. VIII, Sec. II, Par. I (b) ("The State Board of Education shall have such powers and duties as provided by law."); OCGA § 20-2-140 (providing that the State Board of Education shall adopt a core curriculum for K-12 that local boards of education must follow). Thus, far from being "exclusive" for 134 years, Maj. Op. at 266, local boards' "control over general K-12 public education" in their respective jurisdictions has long been and remains today directed and limited by an extensive set of statutes, see generally OCGA Title 20, Chapter 2 (Elementary and Secondary Education chapter of the Education Code), as well as extensive rules and regulations, see generally Ga. Comp. R. & Regs. Title 160 (rules of the Georgia Department of Education). Indeed, a local system that wants to establish a local charter school must comply with the governing statutes and regulations. See OCGA §§ 20-2-2063; 20-2-2064 (d); 20-2-2064.1 (b).

The majority's homage to local control of public education — "our constitutions, past and present, have limited governmental authority over the public education of Georgia's children to that level of government closest and most responsive to the taxpayers and parents of the children being educated," Maj. Op. at 266 — ignores this unbroken record of state regulation and oversight. It also is blind to the reality that for much of our history, local boards of education were horribly *un*responsive to a large portion of students and taxpaying parents. As recounted in Division I (B) above, it took oversight and reform from the State level (and ultimately from the federal level) to improve public education for African-American children, and there are no reported cases suggesting that the State's efforts in this area — or in so many other areas of State-led public education reform over the past century — were unconstitutional because the local districts had "exclusive control" over public education.

The reality, as reviewed at length in Division I above and as reflected in the text and structure of our current Constitution, is that public education in Georgia, including the general primary and secondary education that is its main component, has *always* been a responsibility *divided* between the "common" county school systems created by general laws and the entirely separate "independent" or "special" schools and school systems created by special or local laws. The "county" boards of education referenced in the 1945 Constitution's version of the provision on which the majority relies, and the

"county and area boards" referenced in the current Constitution, have *never* had a monopoly on "general" public education in this State, because independent schools and school systems have always existed and overlapped the general county scheme. Only by trying to blend the independent schools into the common county schools and ignoring the powers of the General Assembly and the State Board of Education can the majority try to make its argument.

It is true that the existence of schools independent of the general county systems has sometimes caused problems for public education, particularly for equitable funding, and so the General Assembly's authority to create new schools separate from the common schools has ebbed and flowed over the past two centuries. See Division I (A)-(G). In particular, since 1945 the General Assembly has been expressly prohibited from creating new independent school *systems*. However, the constitutional authority to create new schools separate from any local school system was revived with the 1960 "area schools" Amendment (if the affected local systems agreed) and expanded with the 1966 "area schools, including special schools" amendment (if the General Assembly acted and the voters in local districts approved). The 1983 Constitution gave the power to create such "special" schools back to the General Assembly alone (so long as the special schools were not supported with local school taxes or bonds). Moreover, any limitation that might have been indicated by the three specific types of special schools listed in the 1966 Amendment and the 1976 Constitution was eliminated in 1983.

## D. *"Special Schools" as a Technical Term of Art*

Because the ordinary meaning, context, and history of the 1983 Constitution's "special schools" provision all fail to support the narrow "special students schools" reading that the local systems seek, or the "special students *or* special curriculum schools" reading that the majority proposes, they must claim that the phrase should be understood as a specialized term of art. However, neither the local systems nor the majority have identified anything about the nature or context of the "special schools" provision that would show that the term was used "in a technical sense," as needed to rebut the presumption that the term carries its ordinary meaning. *Clarke*, 199 Ga. at 164. And in any event, the use of the phrase in Georgia law before the 1983 Constitution and statements by framers of that Constitution indicate that "special schools" did not bear such a restricted meaning.

### 1. *References to "Special Schools" in Statutes and Case Law*

The local systems direct us to the Adequate Program for Education in Georgia Act of 1974, an important piece of public education legislation which provided that "[t]he State Board of

Education shall annually determine the amount of funds needed for the operation of the State schools for the deaf and blind and such other special schools for exceptional persons as may be established by the State Board of Education." Ga. L. 1974, pp. 1045, 1051. The APEG Act indicates that the General Assembly in 1974 understood "special schools" to *include* "schools for exceptional students" like deaf and blind students. That is no surprise, since "schools for exceptional children" were among the three types of "special schools" specifically listed in the 1966 Amendment. See Division I (F) above. However, this legislation cannot fairly be read as *limiting* special schools to that single category, because the constitutional amendment enacted eight years earlier also described "vocational trade schools . . . and schools for adult education" as types of special schools.

As discussed in Division I (C) above, in the decades before the term "special school" first appeared in the Constitution in 1966 (as well as in a statute that remains in effect today and a 1981 case from this Court), the General Assembly, this Court, and the Court of Appeals all used the term "special school" to refer to schools and school systems independent of the "common" county school systems — a meaning that is consistent with the ordinary meaning, context, and history of the constitutional provision. In stark contrast, the local systems and the majority have not identified *any* uses of the term "special school" in our pre-constitutional law that limited it to schools for special needs students or schools teaching special subjects.

I do not contend that these limited examples of pre-1966 usage are overwhelming evidence; then again, I am not the one trying to prove that "special schools" mean something other than what those words ordinarily mean, that some much more limited meaning is so "clear and palpable" as to justify this Court's nullifying as unconstitutional a statute enacted through the democratic process. *Dev. Auth. of DeKalb County*, 286 Ga. at 38; *Clarke*, 199 Ga. at 164. When this Court turns away from the ordinary meaning of words used in legal texts, we commonly look to how the term was previously used in Georgia law, on the theory that the words may have been used the same way by later lawmakers. See *City of Thomaston v. Bridges*, 264 Ga. 4, 6 (439 SE2d 906) (1994) (noting "the well-established rule of construction that absent a clear indication to the contrary, this Court should accord to virtually identical language in successor provisions the same construction given the original language" and explaining that "[t]his rule reflects the value of consistency in the interpretation of legal language").

Thus, it is truly astounding that the majority — which is seeking to place an extraordinary meaning on the term "special school" —

derides this evidence of pre-constitutional meaning as "a few brief instances of ill-considered language" and "unrelated to the 'special school' provision first incorporated into our constitution in 1966." Maj. Op. at 274. "Special schools" as independently-created schools is how Georgia's legislators and appellate judges appear to have understood and used the term before people much like them drafted the constitutional language. To the majority, however, any evidence undermining its conclusion is simply not "pertinent." Id.

### 2. *Attorney General Opinions*

In a similar vein, the majority drops a footnote saying that "the State Attorney General can[not] determine the meaning of 'special schools.'" Maj. Op. at 272, n. 9. Of course, the Attorney General's interpretation of Georgia law is not *binding* on this Court, but our appellate courts have looked to such opinions as *persuasive* authority. See, e.g., *Moore v. Ray*, 269 Ga. 457, 459 (499 SE2d 636) (1998) (explaining that Attorney General opinions are persuasive authority); *In the Interest of J. S.*, 283 Ga. App. 448, 450 (641 SE2d 682) (2007) (same). As discussed in Division I (H) above, two Attorney General opinions have concluded that the General Assembly has expansive authority to create "special schools," including state charter schools pursuant to the 1998 Act. See 2001 Op. Atty. Gen. 2001-9; 1997 Op. Atty. Gen. U97-8. See also 1998 Op. Atty. Gen. U98-2. These opinions have persuasive value, particularly when the local systems and the majority have identified *no* authority, binding or persuasive, to the contrary. But instead of trying to take on the reasoning of these Attorney General opinions, the majority simply brushes them aside.

### 3. *Statements by Drafters of the 1983 Constitution*

In construing our Constitution, we also sometimes look to the understanding expressed by people directly involved in drafting the document. See *Collins*, 198 Ga. at 22. In this respect, we are fortunate to have transcripts of many of the committee and subcommittee meetings that ultimately led to the 1983 Constitution. The majority asserts that these transcripts reveal a "consensus among all the participants that 'special schools' were indeed those schools that enrolled only students with certain special needs or taught only certain special subjects." Maj. Op. at 269. The only true consensus, however, was that the "special schools" provision was being broadened from the version in the 1976 Constitution and that the General Assembly was being granted authority to create such schools without local involvement.

Like the local systems, the majority cites a few statements by drafters indicating that the "special schools" provision was talking about "vocational schools, et cetera" and would allow the General Assembly to create additional schools for the deaf and blind and

other "exceptional children." See Maj. Op. at 269-270. These references to the types of "special schools" that were listed in the then-existing 1976 Constitution, while understandable because constitutional language is often discussed in relation to its current objects, are not limiting. See *Collins*, 198 Ga. at 22.

More significantly, the evidence is not so one-sided. For example, in a meeting of the Committee to Revise Article VIII in August 1980, Melvin B. Hill, Jr., who served as the Assistant Executive Director of the Select Committee on Constitutional Revision, explained that he did not include a list of the types of special schools in the new draft "because I thought that even a definition of special schools should be provided by [statutory] law." Select Committee on Constitutional Revisions, 1977-1981, Transcripts of Meetings, Committee to Revise Article VIII, Vol. III, Aug. 21, 1980, p. 53. When committee members were asked later in the same meeting if they would like to "specify the kinds of special schools we have in mind," LeAnna Walton responded, "I think this is sufficient. I think when you start naming them you could think of fifty million different kinds. I think it's better not to name them at all, let the laws provide like you say." Id. at 55. Chairman Donald Thornhill responded that he wanted to ensure the term was broad, stating that "[i]f you name one or two, that limits it to them." Id.

The best evidence, of course, is not what various framers said to each other at various points during the process, but what they ultimately drafted together — the actual Constitution that the citizens of Georgia then ratified. The 1983 Constitution deleted the three examples of special schools, indicating that, to the extent those examples ever limited the scope of the term, it had now been broadened to "thereby authoriz[e] the General Assembly to provide by law for the creation of any type of *special* school." Maj. Op. at 267.

**E. *The Illogical Results of the Majority's Interpretation***

The majority's construction of the "special schools" provision also leads to results that are illogical and again contravene basic principles of constitutional interpretation.

**1. *If Special Schools Need Only Have a Different Student Body or Teach a Different Curriculum from the Typical Local School in Georgia, the Majority Should Not Strike Down the 2008 Act on Its Face or As Applied to the Appellee Charter Schools***

The majority opinion is somewhat cagey about what the "local school" baseline is to which a "special school" is to be compared; it is also inconsistent as to just how different a special school must be in terms of its student body and curriculum. At times the majority speaks of special schools as having to be different in their student bodies and curricula from local K-12 schools in general. See, e.g.,

Maj. Op. at 271, 272. If the point of comparison is the "average" or "general" or "typical" local school in Georgia, then — as Justice Melton's additional dissent emphasizes — the majority's opinion is wrong both in striking down the Commission Charter Schools Act on its face and in reversing the trial court's judgment as to the three charter school appellees without any as-applied examination of those schools.

It is not clear how one would go about defining the "average" or "typical" local public school in Georgia; the variations between and within school systems across the State — between, for example, urban schools with mostly disadvantaged students, the most well-funded suburban schools, and rural schools in sparsely populated counties — can be enormous. But it is indisputable that the general K-12 local school in Georgia has a student body that includes both boys and girls; there are very few public schools that enroll a student body consisting only of girls, like Ivy Prep.[21] Perhaps the majority would say that gender is not relevant to the composition of a student body, but why would that be? There is ample debate about the virtues and vices of single-gender schools, but little debate that such schools are considerably different from dual-gender schools. See, e.g., http://www.atlanta.k12.ga.us/186110129142943423/blank/browse. asp?A=383&BMDRN=2000&BCOB=0&C=55201 (Atlanta Public Schools website discussing new pilot single-gender academies, noting that the federal No Child Left Behind Act was amended in 2004 to provide public schools the flexibility to create single-gender class-rooms and schools, and explaining that "[t]he United States Depart-ment of Education completed an extensive report on the impact of single-gender education on student achievement. Hundreds of stud-ies were reviewed for the report and the majority of the research supports single-gender schools."). If such an obvious factor as gender does not differentiate a student body, then what factors do? The majority does not say.

Similarly, I have seen no evidence that Georgia's "general" K-12 local schools offer "a year round program with multi-age, student-centered classrooms featuring pedagogy that is based on construc-tivist and multiple intelligence learning" like CCAT. Why is that curriculum not sufficiently different to qualify as "special"? Again, the majority does not say.

If a "special school" is to be compared to the *ordinary* local

---

[21] Of course, in earlier periods of our history single-sex public schools were more common, as illustrated by the well-known Boys High School and Girls High School in Atlanta. This raises the added problem, under the majority's approach, of a school that is "special" when it is created but later loses its distinctiveness, in terms of student body or subjects taught, as local schools change. Does a "once-but-no-longer special" school become unconstitutional?

school and must only differ *to some extent*, then the Charter Schools Commission could create all sorts of commission charter schools that should satisfy constitutional scrutiny, even if the three charter schools at issue in this case are not "different" enough to satisfy the majority. If that is the case, the majority errs in striking down the 2008 Act on its face. See *Blevins*, 288 Ga. at 118 (holding that a statute may be facially challenged only " 'by establish[ing] that no set of circumstances exists under which the (statute) would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that the statute lacks a plainly legitimate sweep.' ").

In the normal course of constitutional adjudication, this Court would clearly hold what a "special school" is, and the Commission would then be limited to creating such schools, since the Commission is authorized to create only "special schools" as defined in the Constitution. See OCGA § 20-2-2081 (2) (defining the "commission charter school" as a "charter school authorized by the commission . . . whose creation is authorized as a special school pursuant to Article VIII, Section V, Paragraph VII of the Constitution"). Particularly given the Constitution's broad grant of authority to the General Assembly to "provide by law" for the creation of special schools, this Court would also normally defer substantially to the General Assembly and the administrative commission it has established in deciding whether the differences in students and curriculum proposed by a commission charter school are sufficient.

Moreover, before proceeding to strike down a statute on its face, this Court would normally consider as-applied challenges, in this case the constitutionality of the 2008 Act as applied to create the three appellee commission charter schools. The majority does not describe in any detail the student bodies or curricula of those schools to explain why the students attending or subjects taught at Ivy Prep, CCAT, and Heron Bay are not sufficiently "special" as compared to local schools. The majority does none of this because to do it might leave alive a sliver of the concept of commission charter schools, which the majority instead seeks to eliminate entirely.[22]

---

[22] Even if the Commission were not abrogated but instead directed to define "special schools" using the majority's narrow interpretation, the creation of commission charter schools would be effectively deterred by the majority's brooding presence as a micromanager of "specialness." Who would want to put in the considerable time and effort needed to organize a charter school – even one with an extremely unusual student body or curriculum – and seek approval for it from the Commission, and what parents would risk enrolling their children in a start-up commission charter school, knowing that a lawsuit and this Court lay lurking in the future, where a few judges might decide that the school was not quite "special" enough in their opinion, rendering the school a nullity and leaving its students to find a new educational home?

## 2. If a Special School Must Be "Categorically Different" in Students and Curriculum from Any School that "Local School Boards Are Also Authorized to Create," Then the "Special Schools" Provision Is a Dead Letter

The majority's response to Justice Melton's dissent clarifies, however, that the baseline to which the majority believes a "special school" must be compared is not the average or ordinary local school in Georgia, but *any* local school that exists or might ever be created in our State — that is, any school that "local boards of education are also authorized to create." Maj. Op. at 276 n.11. Indeed, in rejecting the suggestion that a state chartered school's unique operating charter is relevant, the majority says that, like the children in Lake Wobegon, in Georgia *no* public school is average. "[E]very general K-12 school has 'a unique operating charter' — whether memorialized in writing or merely implicit in the unique nature of each school's faculty, administration and student body." Maj. Op. at 273. Moreover, the majority ultimately concludes that to be a "special school," the school's student body or curriculum must be not just reasonably or even substantially different from any local school's. Instead, the special school must "enroll students *categorically different* from those at locally controlled schools or teach subjects *wholly unlike* those that may be taught in locally controlled schools." Id. at 274 (emphasis added).

If that is true, I agree that the majority must strike down the 2008 Act on its face, because no commission charter school could ever be created that meets that demanding test. But if that is true, then it is equally true that no "special school" *of any kind* could withstand such scrutiny, which renders Article VIII, Section V, Paragraph VII (a) of our Constitution a dead letter. This exposes another fundamental defect in the majority's interpretation, because as the majority recognizes, "[e]stablished rules of constitutional construction prohibit us from any interpretation that would render a word superfluous or meaningless." Maj. Op. at 271 (citing *Blum v. Schrader*, 281 Ga. 238, 241 (637 SE2d 396) (2006)). That rule applies with even more force to the majority's relegation into oblivion of an entire paragraph of the Constitution.

Under the majority's definition, no school can be "special," because the range of students educated in and subjects taught in "general" county and independent school systems across Georgia is nearly boundless. Among other things, every local school system must enroll (and some local districts have entire schools devoted to) gifted, disabled, and other "exceptional students," see OCGA § 20-2-152 (a), (b), and many local schools also provide adult education

and vocational subjects.[23] It follows — assuming the majority's definition was correct — that no "special schools" may be created enrolling these types of students or teaching these types of subjects, even though those are the three types of "special schools" that were expressly listed in the 1966 Amendment and 1976 Constitution and the 1983 Constitution is even broader, as the majority concedes.

To cite just one local school system as an example, along with enrolling a wide array of special needs students and teaching an enormous variety of subjects in its regular schools, the DeKalb County School System has 14 "school centers" including a K-12 school for students with severe and profound multiple disabilities (the Margaret Harris Comprehensive School); an academy for students up to the adult age of 20 who have not been successful in traditional schools but wish to earn a high school diploma (the Gateway to College Academy); and the DeKalb High School of Technology South, which offers technical diplomas and seals. See generally http://www.dekalb.k12.ga.us/schools/centers/index.html (DeKalb County School System website).

Indeed, this defect in the majority's interpretation extends to one type of school that the appellant local systems have always said, and the majority seems to acknowledge, are the quintessential "special school" — schools for blind and deaf children like the Georgia School for the Deaf, the Georgia Academy for the Blind, and the Atlanta Area School for the Blind. Those schools teach their students subjects like reading, math, and science that are included in Georgia's general primary and secondary school curriculum — subjects not different, much less *wholly unlike* those that may be taught in locally controlled schools." Maj. Op. at 274. And not all deaf and blind students attend those three area schools; some attend their local schools, which are required by state and federal law to provide public education to such disabled students. See OCGA §§ 20-2-133; 20-2-152; 20-2-281; 20 USC § 1400 et seq. (the Individuals with Disabilities Education Act). Thus, schools that enroll only blind and deaf students do not "enroll students *categorically different* from those at locally controlled schools." Maj. Op. at 274. Just as they are authorized to create a single-sex school like Ivy Prep, "local boards of education are also authorized to create" a school for deaf or blind children, and so, under the majority's view, such schools cannot be

---

[23] See, e.g., Georgia Dept. of Ed., CTAE Annual Report 2009, available at http://public.doe.ga.us/DMGetDocument.aspx/CTAE_2009_Annual_Report_final.pdf?p= 6CC6799F8C1371F682073500733C6C8C2C2F0A3B069682C67F4701BF03730783&Type=D (report of Georgia's Career, Technical and Agricultural Education program, which coordinates vocational education for grade 6-12 students in public schools statewide).

"special." Maj. Op. at 276 n. 11. Fortunately, the three existing schools created outside the local systems to educate Georgia's deaf and blind children should survive the majority's opinion, under the Constitution's grandfather clause for special schools created prior to 1983. See Ga. Const. of 1983, Art. VIII, Sec. V, Par. VII (b). But four judges of this Court have decreed that there shall be no more of them.

As noted in Division I (I) above, the local systems have never challenged the constitutionality of the Charter Schools Act of 1998 or the "state chartered special schools" created under that act — which, unlike the 2008 Act, has no effect on the state and federal funds that the local systems receive. Nevertheless, and notwithstanding the majority's purported disclaimer, see Maj. Op. at 267 n. 5, it is clear that the majority's conclusion applies equally to invalidate those state-chartered schools, whose student bodies and curricula do not (and could never) meet the majority's test. I expect that this will come as a surprise to those schools and the many parents who have enrolled their children there.

**3. The Majority's False Premise Overrules This Court's "Adequate Public Education" Precedent and Throws Public Education Law in Georgia into Turmoil**

The charter school appellees point out that, in addition to being historically and textually wrong, the majority's premise that local boards of education have "exclusive control" over K-12 public education quietly but directly overrules this Court's seminal "adequate public education" precedent and throws much of Georgia's public education law into turmoil. In *McDaniel*, this Court interpreted a provision of the 1976 Constitution identical to Article VIII, Section I, Paragraph I of the current Constitution as follows:

> The Georgia constitution thus contains very specific provisions relating to the obligation of localities to impose a tax for the maintenance of the public schools and general provisions imposing *a duty on the state and General Assembly to provide its citizens an "adequate education."*

248 Ga. at 643 (emphasis added).

The Court's conclusion that the State and its legislature, rather than the various local school boards, have the responsibility to provide for adequate public education in Georgia was hardly surprising, since the constitutional text then and now states that the duty to provide an "adequate public education" is "a primary obligation *of the State of Georgia*" and local school systems are not mentioned until several sections later, after provisions regarding the State Board of Education, State School Superintendent, and Board of

Regents. See Ga. Const. of 1983, Art. VIII, Secs. I-V. Nevertheless, without mention of *McDaniel*'s contrary holding, the majority squarely rejects it, stating that "as to general K-12 public education, local boards of education have the exclusive authority to fulfill one of the 'primary obligation(s) of the State of Georgia,' namely, '(t)he provision of an adequate public education for the citizens,'" Maj. Op. at 266 (quoting Art. VIII, Sec. I, Par. I).

This is truly stunning, not just because it entirely ignores stare decisis considerations that the Justices in the majority have elsewhere trumpeted, see, e.g., *State v. Jackson*, 287 Ga. 646, 663-664 (697 SE2d 757) (2010) (Thompson, J., joined by Hunstein, C. J., and Benham, J., dissenting), but in the potential implications for both the State and local school districts. If the majority means what it says, then the balance of authority and responsibility for public education in Georgia has suddenly been flipped upside down. If the local boards of education really have "exclusive control" over K-12 public education, then the State's many statutes and regulations establishing uniform and minimum guidelines for public schools statewide, see, e.g., OCGA Title 20, Chapter 2; Ga. Comp. R. & Regs. Title 160, are of dubious constitutionality. Some local school systems, and champions of local control over public education, might like the freedom that comes with this part of the equation, but it haphazardly undermines the scheme of public education that has existed in Georgia for generations.

Moreover, I doubt that many local school systems will enjoy the majority's conclusion that they now "exclusively" bear the constitutional duty of providing K-12 public education within their limits. It follows that the State, which continues to struggle with severe budget pressures but has continued to spend more on public education than on anything else, needs no longer provide any funding for general primary and secondary public education as a matter of constitutional obligation. Of course, the General Assembly may still choose to do so, but if there is a shortfall, the majority says it is now the local districts' constitutional duty to raise the necessary taxes. Likewise, those wishing to litigate the adequacy of public education in Georgia need not do so on a statewide basis, as in *McDaniel*. Now any local district that fails to provide an "adequate public education" for the students it serves may face a constitutional lawsuit.

The appellants never argued for what the majority has given them and their fellow local school systems, and they may come to regret their "victory" on the relatively minor issue of state-chartered schools as they deal with the turmoil and new obligations that the majority opinion generates. Of course, this assumes that today's decision actually reflects the majority's position. I do not believe the majority intends to produce these radical results, or

indeed that the majority contemplated these consequences of its historically and textually mistaken conclusion until the motions for reconsideration pointed them out. I therefore expect that the majority will simply ignore or distinguish its decision today when fair application of its reasoning would produce results that the majority does not favor. Or there may come a day when a different set of facts will lead this Court to recognize its error and forthrightly overrule this case.

## III. *Conclusion*

The ordinary meaning of the constitutional text, its context and history, prior usage, and basic language and logic all support the conclusion that "special schools," as that phrase is used in the 1983 Constitution, are simply individual public schools that are created by the General Assembly separate from the general county and area school systems. Special schools certainly may include schools for students with special needs, like the existing area schools for blind and deaf children, and schools that teach special subjects, like vocational trade schools. But the Legislature's authority is not limited to creating those two types of special schools.

It is hard to understand why the majority is so determined to eviscerate the special schools provision. Running through the majority opinion, however, are several obvious policy views. First, there is the view that local boards of education should have "exclusive" control over general K-12 public education. Local school boards have broad control over the schools in their districts. As demonstrated above, however, it is incorrect as a matter of both history and current law to say that such control is "exclusive" of the General Assembly and the State Board of Education and that no schools providing regular primary and secondary public education have been created or can be created outside the scheme of local (county and area) school systems established by the Constitution. The General Assembly has created schools and school systems independent of the common county systems since the early years of this State, and the 1983 Constitution restored its power to create such special schools (but not school systems) without any local system approval or participation.

The majority also repeatedly expresses concern that the General Assembly will use its authority to create "special schools" to "duplicate the efforts of local boards of education in establishing and maintaining general K-12 schools." Maj. Op. at 266. But unless such duplication is deemed to exist whenever an individual special school resembles any local school that exists or could be created in the State — in which case there can be no "special schools" at all, as discussed in the previous subdivision — no significant duplication exists to

date. As noted at the end of Division I above, well under 1% of the almost 2,300 public schools in Georgia are commission charter schools, state chartered special schools established under the 1998 Act, or area schools for the deaf and blind. That is hardly "duplication" of the local school systems — the 99% component of K-12 public education.

Moreover, no substantial duplication is ever likely to exist without amendment of the Constitution. The number of special schools is unlikely to grow exponentially, in part because "special schools" must be created as individual *schools*, rather than part of a school *system*. Even if commission charter schools prove successful and popular, it would be impractical for the Commission to try to control, manage, and operate, on a school-by-school basis, the number of individual schools that would be required to meaningfully duplicate Georgia's existing local schools. The Commission cannot establish schools where and as needed on its own volition, but instead considers whatever charter petitions are submitted; it has no superintendent; and it has no authority to raise funds for the operation of special schools through taxes or borrowing, to set a curriculum, to hire or fire teachers, to provide for student meals and transportation, or to otherwise operate the schools that it charters. See OCGA § 20-2-2083. In addition, the State has no ability to increase the funding available for its charter schools except by increasing taxes statewide. To run commission charter schools as an interconnected system or group of systems that could substantially replicate the local school systems would require a constitutional amendment. Thus, the majority's concerns about "duplication" are both premature and speculative — the type of concerns that cannot justify ruling that a statute like the Georgia Charter Schools Commission Act of 2008 is unconstitutional *today, on its face*. See *Blevins*, 288 Ga. at 118.[24]

---

[24] To overstate the threat supposedly posed by commission charter schools to the local school systems, the majority cites the portions of the 2008 Act that say that "[a] commission charter school shall exist as a public school within the state as a component of the delivery of public education within Georgia's K-12 education system," OCGA § 20-2-2081 (2), and that the Commission should collaborate with cosponsors like cities, counties, and colleges "for the purpose of providing the highest level of public education to all students, including, but not limited to, low-income, low-performing, gifted, and underserved student populations and to students with special needs," OCGA § 20-2-2083 (b) (12). See Maj. Op. at 267, 272. These provisions do not direct the Commission to duplicate the entire local public education structure. Instead, the first merely provides that commission charter schools must be in-state public (not private) schools in the K-12 education system (as opposed to the higher education system that is also part of Georgia's public education structure). The second emphasizes that commission charter schools – like every other public school in Georgia – may not discriminate against any type of student and indeed should seek to improve public education for the poor, the needy, and the gifted.

Finally, and relatedly, the majority believes that local school systems should not have to "compete" to any extent with commission charter schools or other special schools, i.e., that local schools should have a monopoly on "general" K-12 public education in Georgia. Maj. Op. at 266. As shown above, that belief is not rooted in constitutional law or history. Purely as a matter of policy, it can be argued that public education should be enhanced solely by improving local school systems, including by increasing the number of charter schools established under local control, rather than by shifting any efforts or resources to state chartered special schools. But it can also be argued that public education in Georgia will be improved to a greater extent by having an entity in addition to the local school boards that can authorize charter schools and by creating some schools outside the control of the local systems — or at least that doing so is a worthy experiment.

I do not know which side of that policy debate is correct. I am a judge, not a policymaker, and " 'the courts are not permitted to concern themselves with the wisdom of an act,' " only with whether legislation is clearly prohibited by a constitutional provision. *Dev. Auth. of DeKalb County*, 286 Ga. at 41. (citation omitted). I do know that the policy position that the majority of this Court reads into our Constitution today contravenes the education policy established by both our State's Republican Governor and Republican-majority General Assembly that passed the 2008 Act and our nation's Democratic President and the Democratic-majority Congress that funded the "Race to the Top" program from which Georgia has received $400 million in funding in part due to the State's multiple charter school authorizers. See Division I (K) above. That should give pause to any judge inclined to use our decisions to set good policy.

More fundamentally, I recognize that judges have no special competence in education policy and that litigation is ill-suited to gather the sort of information and make the sort of nuanced and balanced assessments required for good social policy. Today's majority disregards the wise remarks this Court made 30 years ago regarding our role in reviewing education legislation:

"Education . . . presents a myriad of 'intractable economic, social, and even philosophical problems.' The very complexity of the problems . . . suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect . . . . [T]he judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints

that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions."

*McDaniel*, 248 Ga. at 647 (citations omitted). Courts should strike down education-related legislation only where the Constitution "clearly and palpably" prohibits the policy determination at issue. *Dev. Auth. of DeKalb County*, 286 Ga. at 38. That is not the case here.

Some local public school systems (and no doubt some Georgia citizens as well) oppose commission charter schools, and they fear reductions in revenue that will make their important work more difficult. But the local systems are far from defenseless in the political process that shapes education policy in Georgia. Beyond their own political power, the members and constituents of every local school board are also constituents of their state legislators, the School Superintendent, and the Governor, and thus they have considerable influence over how our state government exercises the "special school" authority granted under our Constitution. The majority complains that the Commission is not sufficiently accountable to our citizens, see Maj. Op. at 273-274, but the commissioners are as accountable as the many other appointed officials in our State Government who make decisions that affect every Georgian.

The majority also expresses concern for local taxpayers who reside in the areas from which "local school taxes are raised." Maj. Op. at 273. However, under the express terms of the Constitution's "special schools" provision and the statutory formula for funding commission charter schools, see OCGA § 20-2-2090, local school taxes may be used to support a charter school only if the citizens of the local areas affected vote to do so. *Not a single dollar of local school taxes goes, directly or indirectly, to commission charter schools.* They receive only state and federal funds, and Georgians may hold their state and federal public officials accountable for this expenditure as much as any other use of their state and federal taxes.

But the policy debate and the political process no longer matter. The majority of this Court has announced the new policy and removed the issue from the political process, unless the General Assembly and the people of our State bear the delay and enormous burden required to correct the Court's error through a constitutional amendment.

To all of this, the majority replies, "We have carefully considered the remaining arguments raised in support of the Act by the dissent and find them to be without merit." Maj. Op. at 276. Apparently we must all take it on faith that the majority has convincing responses to the many flaws in its textual, historical, and logical analysis

identified above. In reality, the majority's refusal to address those criticisms indicates that it has no persuasive responses.

Contrary to the majority's untenable opinion, the 1983 Georgia Constitution does not prohibit the creation of the Charter Schools Commission or commission charter schools. Nor do any of the other challenges raised by the appellants have merit. I would therefore affirm the judgment of the trial court, and so I dissent.

I am authorized to state that Presiding Justice Carley and Justice Melton join in this dissent.

DECIDED MAY 16, 2011 —
RECONSIDERATION DENIED JUNE 13, 2011.

*Edenfield, Cox, Bruce & Classens, Gerald M. Edenfield, Susan W. Cox, Charles P. Aaron, Balch & Bingham, T. Joshua R. Archer, Michael J. Bowers, Joshua M. Moore, Smith, Welch & Brittain, A. J. Welch, Jr., Santana T. Flanigan, Timothy N. Shepherd, Thomas A. Cox*, for appellants.

*McKenna, Long & Aldridge, Bruce P. Brown, Ellen C. Carothers, Jeremy T. Berry, Turner, Bachman & Garrett, Judson H. Turner, Robert L. Fortson, Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, Stefan E. Ritter, Senior Assistant Attorney General*, for appellees.

*Harben, Hartley & Hawkins, Phillip L. Hartley, Martha M. Pearson, Buckley & Klein, Michael E. Kramer, Arnall, Golden & Gregory, Sarina M. Russotto, Gilbert, Harrell, Sumerford & Martin, Mark M. Middleton, Mark D. Johnson, RobbinsFreed, Joshua B. Belinfante, Alexa R. Ross, Andrew W. Broy*, amici curiae.